SCHOTT, Judge.
This is a suit on a promissory note for $33,250 made by defendant, Peter F. Johnson on February 26, 1975, payable on demand, to the order of plaintiff, Donald C. Scafidi. Defendant admitted the execution of and failure to pay the note but alleged that he had given plaintiff the note at plaintiff’s request to facilitate plaintiff’s plans to take control of two companies, Creole Shipping, Ltd. and Creole Lines, Ltd., with the understanding that defendant would not be expected or required to pay the note. Defendant has appealed from a judgment in plaintiff’s favor as prayed for. The issues are whether the trial court properly excluded defendant’s parol evidence as to the alleged agreement between the parties; and, if not properly excluded, whether the evidence supports defendant’s position.
For several years defendant had worked under plaintiff’s supervision for a shipping *317 company and the two were close friends. When plaintiff became a part owner of the Creole shipping companies he hired defendant along with Jose Balduz and Joe Kramer to work for him. Initially plaintiff owned about 30% of the stock of the companies and two investors each owned 30%. Defendant was given 5% of the stock and Balduz and Kramer were each given 2V2% of the stock. In December, 1974, the companies were in financial difficulty and needed additional capital. Plaintiff conceived the idea of the companies issuing additional stock in order to increase the companies’ capital and to enable him to take control of the companies since the two investors were both in financial difficulty and could not exercise their preemptive right to purchase additional stock. Accordingly, plaintiff put up $200,000 to purchase additional stock, Johnson put up $33,500, and Balduz and Kramer put up $16,750 each, with the result that the four together gained control of the companies although plaintiff alone became the owner of about 45% of the stock in the companies.
According to plaintiff, his preemptive rights as a stockholder entitled him to purchase a sufficient number of shares of stock in the companies when the new stock was issued so that he could have gotten control of the companies on his own, but he wanted his three employees, Johnson, Balduz and Kramer to have a greater interest in the business. Since they did not have the money to purchase their shares of the stock, plaintiff borrowed the money himself and loaned it to the three, taking stock pledges from them as security. The note sued on was given by defendant to plaintiff for the money used by defendant to purchase his additional stock. Asked at trial whether he had discussed with the three “partners” how he expected the loans to be repaid, plaintiff testified as follows:
“Yes, I did and I expected the loan — I mean, we were all working in a company that we were hoping was going to succeed. That was our primary source of income and I told them as the company succeeded that is where we are making our money, there will be dividends and bonuses and you can pay me back out of the monies we made in the company.”
Plaintiff was then asked the following question: “You expressly told them you could be paid back by the monies made in the company, is that correct?” He answered: “That was the only way.”
However, when asked further whether he told defendant and the others that they would not have to pay the notes other than through company earnings, he stated that this would have made no sense. If that were the case, he explained, he would have simply given them the money.
On the other hand, defendant testified that he was plaintiff’s employee and friend and had implicit trust in and loyalty to plaintiff. He professed to be naive with respect to plaintiff’s financial dealings in establishing the companies, working with the outside investors and putting additional capital in the companies, and stated that he was willing to go along with plaintiff’s idea because he trusted him. Nonetheless, he testified that plaintiff assured him when he signed the note that he would never be expected to pay the note back. According to defendant, plaintiff told him at the time he signed the note that he didn’t have to worry about it, “it is just for record purposes only.”
The companies continued to have problems and did not succeed. Defendant left plaintiff to take on a new job operating a ship. According to plaintiff defendant had set up this arrangement for himself while he was employed by plaintiff and while plaintiff was trying to make the same arrangement concerning the same ship for the benefit of the Creole Companies.
Defendant called Jose Balduz as his own witness. He testified that he too signed a note for $16,750 to plaintiff’s order similar to the one signed by defendant, with the clear understanding that the note would not have to be paid. However, Balduz was subsequently forgiven his note by plaintiff. According to plaintiff, he felt he owed this to Balduz because he stayed with him even to the extent of working without compensa *318 tion whereas defendant had abandoned him and taken on the other contract.
In deciding the case in plaintiff’s favor the trial judge made several significant factual findings: 1) At meetings of the stockholders of the companies in June, 1975, defendant voted the stock he acquired with the money loaned by plaintiff. 2) Early in 1976 defendant paid plaintiff $3,900 for interest on the note. 3) Defendant admitted that had the companies been successful he would have accepted dividends on his stock.
The minutes of meetings of the stockholders of the two companies held on June 10, 1975, show that the only affirmative action taken was the election of a new board of directors for each company. In each case defendant, Balduz and Kramer were elected to replace the outside investors on the board. This was consistent with plaintiff’s scheme to take control of the companies and was not, in itself, prejudicial to defendant’s position as to his liability on the note.
As to the interest payment, plaintiff had borrowed the money he gave to defendant and the others from a company called Pyramid Venture Group for which defendant, Balduz, and Kramer had worked before the Creole Companies were formed. When Pyramid pressed plaintiff to pay interest on his note, Pyramid decided to pay bonuses to defendant, Balduz, and Kramer, which would enable them to pay interest on their notes to plaintiff and would enable him, in turn, to pay interest to Pyramid. According to defendant, the interest payment “was arranged” by plaintiff. “I had no knowledge of where the monies were coming.” He was told that it was from Pyramid where there was “a little left over,” that he should deposit the check in his account, write one to plaintiff, “and it is a washout.” Thus, this interest payment was engineered by plaintiff for reasons best known to him and Pyramid, but it was not a voluntary payment on defendant’s part.
Defendant’s admission that had the companies succeeded he would have accepted dividends on the stock is perhaps the most difficult to understand if his position is accepted. However, the initial stock in the companies was given to the three at plaintiff’s insistence and the issuance of the new stock was designed, primarily, to enable plaintiff to take over the companies. Plaintiff admitted that one reason for his having the new stock issued to the three employees was “the delusion of those other shareholders,” the outside investors. Defendant’s testimony that he would not have to pay for the stock was identical to Balduz’s. Under all these circumstances his testimony was credible.
In any event, the trial judge’s principal reason for judgment was his legal conclusion that the absence of a written agreement between the parties was fatal to defendant’s position that the terms and conditions of the note were varied. He based this conclusion on LSA-R.S. 10:3-119, from the Commercial Laws, which provides:
“As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction . . ."
At the outset of this discussion, we note that this section does not purport to be a restatement of the Louisiana Parol Evidence Rule found in LSA C.C. Art. 2276 or our laws relative to defects of consent in the confection of a contract found in C.C. Arts. 1819 et seq. R.S. 10:1-103 provides that the other laws of Louisiana apply unless displaced by particular provisions of the Commercial Laws.
We do not construe R.S. 10:3-119 to be a repudiation of the following principle found in Gulf States Finance Corp. v. Airline Auto Sales, Inc., 248 La. 591, 181 So.2d 36 (1965):
“It may not be contended for example, that, as between the parties to an instrument parol evidence is incompetent to show fraud, mistake, illegality, want or failure of consideration, to explain an ambiguity when such explanation is not inconsistent with the written terms, or to show that the writing is only a part of an *319 entire oral contract between the parties.” (Emphasis part of original text)
This principle was repeated and applied in Gautreau v. Modern Finance Co. of Gonzales, 357 So.2d 871 (La.App. 1st Cir. 1978) and Pittman v. Roberts, 337 So.2d 541 (La. App. 2nd Cir. 1976).
There is no doubt from the testimony of plaintiff himself that the note sued on did not embody the entire transaction between these parties and that the principle clearly applies. It is impossible to discuss consideration for the note without an understanding of the motives plaintiff had for letting defendant and the other two employees buy stock and the sources of the funds which defendant and the others used to purchase the stock. By his own testimony, plaintiff expected them to pay the stock only out of the earnings which he expected them to receive from the company. He only differed with them on the point that if the company did not succeed they would not have to repay the note.
As stated in CIT Finan. Serv. Corp. v. Robinson, 335 So.2d 501 (La.App. 3rd Cir. 1976) writ refused, 337 So.2d 878 (1976) the jurisprudential rule is well established that when misrepresentation is alleged parol evidence is admissible to modify the terms of a written agreement. In this case, defendant alleged in his answer that plaintiff made the representation to him when the note was signed that it would not have to be paid, so that his testimony was admissible to prove alleged misrepresentation on plaintiff’s part.
Because the judgment of the trial court was based primarily on an erroneous conclusion of law in the application of R.S. 10:3-119 to the facts of the ease we are convinced that he did not make an adverse credibility determination regarding defendant’s testimony. Thus, we have independently evaluated his credibility.
Because of all the circumstances surrounding the relationship between these parties, plaintiff’s admission that when he took defendant’s note he expected it to be paid only out of company bonuses and dividends; the convincing evidence that the scheme was engineered by plaintiff primarily for his own benefit; the fact that plaintiff and the others were initially given stock in the companies and the plaintiff’s subsequent treatment of the Balduz note in contrast with his somewhat unilateral decision to prosecute the suit against defendant because of defendant’s subsequent conduct in not sticking with him when the company began to fail, we are persuaded by defendant’s testimony and conclude that the evidence preponderates in favor of defendant and against plaintiff as to the oral side agreement made by plaintiff when the note was signed.
Accordingly, the judgment appealed from is reversed and set aside, and there is judgment in favor of defendant Peter F. Johnson, and against plaintiff Donald C. Seafidi, dismissing his petition at his cost.
REVERSED AND RENDERED.