420 So.2d 1113 (1982)
Donald C. SCAFIDI
v.
Peter F. JOHNSON.
No. 82-C-0670.
Supreme Court of Louisiana.
October 18, 1982.
William R. Forrester, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for applicant.
Donald E. Theriot, Nelson & Theriot, New Orleans, for respondent.
WATSON, Justice.
The issue is whether, in a suit by the original obligee against the maker of a promissory note, parol evidence that the promise to pay was a conditional one is admissible.
On February 26, 1975, defendant, Peter F. Johnson, executed a promissory note in favor of plaintiff, Donald C. Scafidi, in the sum of $33,250 plus eight percent interest and twenty-five percent attorney's fees. Plaintiff Scafidi received a trial court judgment on the note. The Court of Appeal reversed. Scafidi v. Johnson, 409 So.2d 316 (La.App. 4 Cir.1981). A writ was granted to review the judgment. 413 So.2d 499 (La.,1982).
Johnson's acquaintance with Scafidi began in 1963 when both were employed in the marine division of Reynolds Metals. Scafidi was operations manager and Johnson worked under his supervision as a ship captain. In 1969, Scafidi left Reynolds. He and a partner formed Pyramid Ventures Group, but it ceased operations in 1974 and a new corporation, Pyramid Marine, was created. In 1973, Johnson began working for Pyramid Ventures and later Pyramid Marine. Forty-five percent of Pyramid Marine was owned by Scafidi. Peter Johnson was given five percent of the company and two other employees, Joe Kramer and Jose Balduz, were each given two and a half percent. Scafidi then formed Creole Lines, Ltd., and Creole Shipping, Ltd., two *1114 Bahamian corporations, with Pyramid Marine as their operating arm. Each Creole company owned two bulk ship carriers. Johnson was given five percent of the stock in those companies and Balduz and Kramer were each given two and a half percent. Scafidi owned thirty percent and two other investors each owned thirty percent of the stock.
In December of 1974, Scafidi decided to issue additional stock to dilute the stock ownership of the other two thirty percent investors.[1] Since the latter were in financial difficulties, they could not exercise their preemptive rights.[2] Scafidi purchased additional stock and became owner of approximately forty-five percent of the Creole companies. Scafidi also loaned Johnson, Balduz and Kramer money for their additional stock.[3] Scafidi intended to help the employees and also to delude the former majority shareholders.[4] Scafidi borrowed $177,000 from Pyramid Venture Group to pay for his stock and that of the three employee-shareholders. Scafidi took notes and stock pledges from the three as security. Johnson executed a $33,250 note; Balduz and Kramer each executed notes for $16,750. Bonuses were paid by Pyramid Ventures to Johnson, Balduz and Kramer which enabled them to make one interest payment to Scafidi and he in turn to Pyramid.
Johnson testified he was told by Scafidi he would never be expected to pay the amount of the note.[5] He and Scafidi were extremely close; Johnson would have given him anything except his wife and children. Scafidi admitted saying that the notes would be paid with money made from the company.[6] Jose Balduz, a disinterested witness who brought stock under the same circumstances, corroborated Johnson's testimony that there was a clear understanding the notes would not have to be paid.[7]
When Johnson left the Creole companies in 1976 to take an independent job as a ship *1115 captain, Scafidi's own plan concerning that ship was undermined. Balduz's note was forgiven by Scafidi on October 29, 1980. Scafidi explained that he owed this to Balduz but not to Johnson.
Scafidi's plan worked. He effectively gained control of the Creole corporations when the new stock was issued. At any time the employee-stockholders' demand notes could have been called and their stock relinquished to him. Thus, he had control of fifty-five percent of the company. The former majority stockholders were effectively divested of control without their knowledge.
The trial court relied on LSA-R.S. 10:3-119 which provides:
"(1) As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument.
"(2) A separate agreement does not affect the negotiability of an instrument."
In the absence of a written agreement, the trial court concluded that Johnson was bound by the terms of the written note.
If plaintiff were a holder in due course, knowledge that the note was accompanied by a separate oral agreement would not impair its negotiability. LSA-R.S. 10:3-304(4)(b).[8] The rights of one who is not a holder in due course are delineated in LSA-R.S. 10:3-306 as follows:
"Unless he has the rights of a holder in due course any person takes the instrument subject to
"(a) all valid claims to it on the part of any person; and
"(b) all defenses of any party which would be available in an action on a simple contract; and
"(c) the defenses of want or failure of consideration, nonperformance of any condition precedent, nondelivery, or delivery for a special purpose; and
"(d) the defense that he or a person through whom he holds the instrument acquired it by theft, or that payment or satisfaction to such holder would be inconsistent with the terms of a restrictive indorsement. The claim of any third person to the instrument is not otherwise available as a defense to any party liable thereon unless the third person himself defends the action for such party." (Emphasis added)
Between two parties to an instrument, parol evidence has always been admissible to show want or failure of consideration. Logically, parol evidence should also be admissible on the other defenses enumerated in section (c) above. Also, parol would be admissible in this instance under the prior Louisiana jurisprudence. Between the parties to an instrument, parol evidence is admissible "to show fraud, mistake, illegality, want or failure of consideration, to explain an ambiguity when such explanation is not inconsistent with the written terms, or to show that the writing is only a part of an entire oral contract between the parties." Gulf States Finance Corp. v. Airline Auto Sales, Inc., 248 La. 591, 181 So.2d 36 at 38 (1965).
There is no question that the initial ten percent of stock was given to the employee-shareholders, Johnson, Kramer and Balduz. It is possible that there was a misunderstanding about the terms on which they acquired the additional ten percent. Johnson and Balduz did not have the financial acumen of Scafidi and they were his loyal subordinates. Scafidi admitted that he encouraged them to think repayment *1116 would be made from corporate dividends. Johnson and Balduz signed the notes under the belief that they would have no personal liability; that any repayment would be made from corporate distributions. There was a condition precedent to Johnson's obligation: that is, receipt of dividends, or other distribution of corporate funds sufficient to make payment. Since there was nonperformance of this condition, Johnson is not liable on the note to Scafidi.[9]
For the foregoing reasons, the judgment of the Court of Appeal is affirmed.
AFFIRMED.
CALOGERO, J., concurs.
DIXON, C.J., dissents.
NOTES
[1] Johnson testified that Scafidi said:

"... I'll issue more stock because I understand now that they got their tail in a wringer financially. We'll eventually issue a new stock and that way I can get these guys out of the control of the corporation and we will work a scheme so I can get control of the company." (Tr. 57)
[2] Johnson described the situation from Scafidi's point of view:

"... Scafidi had to give away more of the stock than he initially intended in those shipping companies and he lost control. He came to us and said, `Okay. These guys are in tough shape financially. Hammons is in poor physical health almost dying and Cuquet is in the slinger with a bank going down the tubes and the Feds are in here examining the ICB. This is an opportunity to get the control of my company back.'" (Tr. 60)
[3] According to Johnson, he said:

"... I'll take care of arranging the funds and that way we will have control of the corporation. That way there is no outsiders and I will have complete control with your voting block of your percentages, all three of you." (Tr. 61)
[4] "Q .... another reason was the delusion of the other shareholders in those other corporations...

"A. [By Scafidi] Yes, I could say that, too." (Tr. 36)
[5] "Specifically he said, `Don't you worry, you will never have to pay that note.'" (Tr. 67)

"... `Don't worry about that, don't even worry about paying it back. I'll take care of that. You run the Goddamn operations and let me take care of the financing and the marketing.'" (Tr. 61)
[6] "... I told them as the company succeeded that is where we are making our money, there will be dividends and bonuses and you can pay me back out of the monies we made in the company.

"Q. You expressly told them you could be paid back by the monies made in the company, is that correct?
"A. That was the only way." (Tr. 39)
* * * * * *
"... I said, `When we make money I'll see you get bonuses and dividends and you can pay me back out of that.'" (Tr. 97)
[7] "Q. What if anything did Mr. Scafidi tell you relative to repayment of that loan?

"A. He told me not to worry about it because he did not want the repayment, that it was just a matter of shoveling papers to get control of the company.
"Q. He specifically told you that he would not look to you personally to repair that loan, is that correct?
"A. That's correct." (Tr. 81)
[8] LSA-R.S. 10:3-304(4)(b) provides:

"(4) Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim
"(b) that it was issued or negotiated in return for an executory promise or accompanied by a separate agreement, unless the purchaser has notice that a defense or claim has arisen from the terms thereof;".
[9] Were the note in the hands of a third party holder in due course or if Scafidi had used it as bank collateral, the result would, of course, be different. See D'Oench, Duhme & Co. v. F.D. I.C., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and Rinaldi v. Young, 92 F.2d 229 (D.C. Cir.1937).