774 F.2d 1043
 CHUNG, YONG IL, et al., Plaintiffs-Appellees, Cross-Appellants,
and
Hanseung Shipping Co., Ltd., Plaintiffs-Appellees,
R. S. Price, Plaintiff-Intervenor, Appellee,
v.
OVERSEAS NAVIGATION CO., LTD., and Jimmy Mardikos,
Defendants, Crossclaim-Plaintiffs,
Counterclaim-Defendants, Third-Party
Plaintiffs-Appellants,
Cross-Appellees.
M.V. BEAVER SPIRIT, etc., Defendant, Crossclaim-Defendant,
HIBERNIA NATIONAL BANK, Defendant-Crossclaim-Defendant,
Counterclaim-Plaintiff, Third-Party
Plaintiff-Appellant, Cross-Appellee,
v.
E.F.D. CAPITOL GROUP INC., and Frank Deutsch, Third-Party
Defendants-Appellants, Cross-Appellees.
 No. 84-7152.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 25, 1985.
 
 Stephen Paul Blank, New York City, Robert S. Edington, Mobile, Ala., for E.F.D. Capitol and Frank Deutsch.
 George A. Frilot, Randell E. Treadaway, New Orleans, La., for Hibernia Nat. Bank.
 Allan R. Wheeler, Broox G. Holmes, Mobile, Ala., Stephen L. Oppenheim, Monticello, N.Y., for Overseas Navigation Co.
 Ross Diamond, III, Mobile, Ala., for Chung, Yong & Crew.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before KRAVITCH and CLARK, Circuit Judges, and WRIGHT*, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 This litigation arose out of an unperformed agreement for the purchase and sale of a cargo ship, the M/V CARMEN A.[1] Caught in the middle are twenty-three Korean nationals who served aboard the vessel, without being paid, while the parties to the contract made the arrangements necessary for the sale. The major issues on appeal relate to the district court's award of penalty wages to the crew members pursuant to 46 U.S.C.A. Sec. 596.[2] We affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.
 
 I. BACKGROUND
 
 2
 The primary parties involved in the events leading to the litigation include Hibernia National Bank in New Orleans (Hibernia or the Bank) and one of its vice presidents, Jay Capouch; Overseas Navigation Co., LTD. (Overseas) and its sole shareholder, James Mardikos; and E.F.D. Capital Group, Inc. (E.F.D.) and its sole shareholder, Frank Deutsch. At all relevant times the M/V CARMEN A was located at a dock in the Port of Mobile, Alabama.
 
 
 3
 On February 24, 1981, the M/V CARMEN A was seized by United States marshals in order to satisfy a stevedore lien. At that time, the vessel was documented under Liberian law, and owned by Armadora Maritima Salvadora Lines, with Hibernia holding a foreign preferred ship mortgage against the vessel. Less than three months later, on May 6, 1981, Hibernia submitted the highest bid for the vessel at a marshal's sale and became its owner. Apparently not interested in operating the ship, Hibernia immediately began negotiations to sell the ship to Mardikos. After an agreement on the terms of the sale had been reached, Mardikos was unable to secure financing from his bank. His bank, however, put him in touch with Deutsch. Deutsch and Mardikos entered into an agreement through their respective corporations: E.F.D. was to purchase the vessel and then lease it to Overseas, which in turn agreed to operate the ship. To demonstrate his good faith, Mardikos advanced $100,000 to Deutsch.
 
 
 4
 When Hibernia learned of the substitution, new negotiations commenced. On May 28, 1981, the parties reached an agreement. E.F.D. agreed to purchase the M/V CARMEN A for $500,000; $350,000 to be paid in cash, including a $50,000 deposit to be made on June 4, 1981, with Hibernia agreeing to finance the remainder of the purchase price. The contract further provided that E.F.D. agreed to take the vessel "as is" and "where is." Because the vessel's registration under Liberian law was insufficient for the sale to go forward, the parties agreed that the vessel should be reinscribed under Panamanian law in Hibernia's name for E.F.D.'s account. Contemplating that the inscription would be uncomplicated, the parties agreed that the buyer would pay inscription costs up to $10,000. If the associated costs exceeded $10,000, and neither party wished to pay the excess, the agreement would be terminated and Hibernia would refund the $50,000 deposit, "provided, however, that should Buyer so elect to terminate this agreement it shall be responsible to Seller for all the aforementioned costs actually incurred by Seller toward the inscription up to the amount of $10,000." The closing of the sale was scheduled to take place within ten working days after the vessel was inscribed. If the buyer wished to withdraw at that point, Hibernia was allowed to keep the $50,000 deposit as its liquidated damages. Deutsch signed the agreement as President of E.F.D. and individually.
 
 
 5
 Shortly after the execution, Hibernia learned that certain repairs to the vessel were necessary for inscription under Panamanian law. Hibernia suggested therefore that the inscription-costs provision of the agreement be raised to $20,000, to which E.F.D. agreed. Upon further inquiry, Hibernia determined that inscription required even more extensive effort than previously anticipated. The bank initiated another amendment to the contract, to which E.F.D. agreed, decreasing the cash down payment and increasing the amount of the purchase price the bank would finance. In addition, the amendment called for elimination of the inscription-costs ceiling and the provision requiring termination if neither party chose to bear the costs to the extent they exceeded that ceiling. As modified, the agreement provided as follows: "Inscription of the Vessel in the name of Seller shall be for the account of Buyer. Payment of the costs incurred in connection with inscription of the vessel in the name of Seller shall be made by Buyer on January 5, 1982."
 
 
 6
 Meanwhile, Mardikos began looking for a crew to operate the M/V CARMEN A. On June 4, 1981, Overseas entered into a contract with Hanseung Shipping Company, whereby Hanseung agreed to locate crew members and send them to the vessel. In the agreement Overseas purported to be acting as an agent on behalf of the M/V CARMEN A. The agreement established the wages payable to the crewmen, and set forth Hanseung's fee for its services and its right to be reimbursed for expenses.
 
 
 7
 Shortly thereafter the bank decided to permit Deutsch to oversee the repairs that were required so that the vessel could be inscribed in the bank's name. On July 6, 1981, Mardikos brought in a ship repair company to inspect the vessel. Mardikos testified that he did this after Deutsch requested that he determine the most economical way to perform the repairs. After consulting with Deutsch and Capouch, Mardikos notified Hanseung to send a crew to the M/V CARMEN A. Twenty-two crew members flew from Korea to Mobile on July 23, boarded the vessel upon their arrival, and immediately began to perform maintenance and repair work to the vessel. An individual employed by Hibernia, who was aboard the M/V CARMEN A when the Korean crew arrived, supervised some of the repairs. In August, because of problems with the vessel's electrical system, Hanseung sent a twenty-third crew member to join the vessel. A number of independent contractors also made repairs to the ship, both before and after the crew's arrival. While this work was being done, Mardikos forwarded to Hibernia a number of invoices relating to the repairs and the crew's expenses, most of which Hibernia paid without objection. On September 3, 1981, the vessel was formally inscribed in Hibernia's name under Panamanian law.
 
 
 8
 The closing for the sale of the vessel was initially scheduled for August 14, and then postponed until August 20. Because the purchaser was not prepared to close on that date, the closing was further postponed to September 1. When the purchaser was unwilling or unable to perform on this date, and again on September 10, Hibernia informed Deutsch that if the sale were not consummated by September 18, Hibernia would consider the contract terminated. The parties scheduled a closing for that date, but postponed it once more until September 25. Again, the sale did not close. Hibernia then sent a telegram to Deutsch advising him that it would retain the $50,000 deposit and that he was "solely responsible for all of the costs and expenses incurred by Seller in connection with the inscription of the vessel and those costs incurred through your agents in Mobile." Further, the bank stated: "[i]mmediate arrangements should be made to pay the costs and expenses incurred by Seller. Direct arrangements should be made with your agents in Mobile as to the payment of those other costs and expenses which you have incurred."
 
 
 9
 The next day Hanseung addressed a telegram to Mardikos, informing him that the crew had not been paid since arriving on the vessel in July, and demanding payment of these accrued wages and reimbursement for expenses Hanseung incurred in locating and sending the crew to the vessel.[3] Hanseung further admonished that in the event the crew was discharged, the crew members were entitled to severance pay and payment for the costs of returning to Korea. Mardikos forwarded this telegram to Hibernia, as he had done with invoices relating to the ship's repair, with the request that Hibernia pay the amount due. Hibernia never responded and no wages were paid.
 
 
 10
 On September 28, a Hanseung representative met with Capouch in New Orleans, at which time Capouch asked that the crew leave the vessel. The crew, however, refused to leave the ship without being paid, and along with Hanseung initiated this lawsuit, naming Overseas, Mardikos, Hibernia, and the M/V CARMEN A as defendants. The complaint called for payment of wages and expenses pursuant to the employment agreement signed by Hanseung and Overseas, and asked that penalty wages be assessed in favor of the crew under 46 U.S.C.A. Sec. 596. The United States marshals arrested the vessel on October 1. Hibernia continued to insist that the crew leave the vessel, but refused to pay the wages earned or the costs of transportation back to Korea. Ultimately, Hibernia agreed to allow the crew members to remain, in case a prospective purchaser wished to hire them. The crew members finally left the vessel and departed for Korea on November 5, 1981, with Hanseung paying their air fare.
 
 
 11
 To release the vessel from the attachment brought about by this lawsuit, Hibernia deposited a $400,000 letter of undertaking, in lieu of a bond, with the district court on November 17, 1981. With this letter, Hibernia guaranteed payment of all maritime liens against the vessel, to the extent of the undertaking.[4] Shortly thereafter, Hibernia sold the vessel to another purchaser.
 
 
 12
 Once Hanseung and the crew initiated this litigation, the proportions of the case swelled significantly. Overseas and Mardikos filed a crossclaim against Hibernia and the vessel for expenses they incurred in the vessel's service, and alleged that Hibernia should be required to reimburse Overseas and Mardikos should plaintiff succeed in imposing liability on them. Overseas also filed a complaint of intervention against the vessel for the same expenses incurred. Hibernia and the vessel responded with a counterclaim against Hanseung and the crew, a cross-claim against Overseas and Mardikos, and a third-party complaint against E.F.D. and Deutsch for breach of the sales agreement and for indemnity. Overseas and Mardikos likewise filed a third-party complaint against E.F.D. and Deutsch for indemnity and for return of a portion of the amount deposited that had not yet been returned. Finally, E.F.D. and Deutsch counterclaimed against Hibernia.[5]
 
 
 13
 After a bench trial, the court below issued its ruling. Following a series of post-trial motions, the court amended its findings and conclusions. The court found that the vessel was liable to the crew for wages earned up until the time of the seizure and to Hanseung for its expenses, including the amounts expended in getting the crew to and from Mobile. Hibernia, as its owner, was liable in personam, for this amount. Liability for the post-seizure wages earned was imposed upon Overseas, which was also ordered to reimburse Hibernia for the costs of repatriating the crew to Korea. The court also ordered that Hibernia and the vessel were liable for penalty wages, with the penalty accruing from the date on which the complaint was filed until February 8, 1983, the date of trial. In addition, the court found that Hibernia was liable to Overseas and Mardikos for expenses incurred, management fees, and an advance made to Hanseung, because it ratified Mardikos' work by accepting the benefits of his efforts. The court further found that according to the terms of the contract E.F.D., and Deutsch individually, were required to indemnify Hibernia for all inscription costs, including the penalty wages. Finally, the court ordered Deutsch to refund the $20,000 retained from Mardikos' initial $100,000 deposit. This appeal followed. Just prior to oral argument, Hibernia paid the crew the wages that had been withheld.
 
 
 14
 II. WHETHER THE CREW WAS ENTITLED TO PENALTY WAGES
 
 
 15
 46 U.S.C.A. Sec. 596 (1958) provides that a seaman shall recover double wages for each day payment of wages is delayed beyond the statutorily prescribed payment date, if the delay is without sufficient cause.[6] Courts have described this statute as "harsh," Mavromatis v. United Greek Shipowners Corp., 179 F.2d 310, 318 (1st Cir.1949), "punitive," Dendrinos v. City of New York, 86 F.Supp. 688, 690 (S.D.N.Y.1949), and capable of producing results that are "both absurd and palpably unjust." Griffin v. Oceanic Contractors Inc., 458 U.S. 564, 586, 102 S.Ct. 3245, 3258, 73 L.Ed.2d 973 (1982) (Stevens, J., dissenting). Whatever courts may think of the wisdom of this statute, its purpose is to provide for the prompt payment of wages to a discharged seaman. See Collie v. Fergusson, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930), and to ensure that a seaman is not turned ashore with little or no money in his pocket. See Malanos v. Chandris, 181 F.Supp. 189 (N.D.N.Y.1959). A seaman's claim for wages is accorded a high priority against a vessel, 46 U.S.C.A. Sec. 953(b) (1958), and the penalty wage provision is fully consistent with the notion that a seaman has a "sacred lien" against a vessel for his earnings.
 
 
 16
 On appeal, Hibernia challenges only the penalty aspect of the district court's award of wages. Hibernia contends that there are three conditions precedent to an award of penalty wages under 46 U.S.C.A. Sec. 596 (1958), all of which must be satisfied before the section can apply: (1) there must have been an agreement under which each seaman claiming penalty wages was shipped; (2) the vessel in question must have commenced and completed a voyage in which the seaman participated; and (3) the master or owner of the vessel must have refused or neglected, without sufficient cause, to pay the seaman's wages after the applicable time limitations had expired. Hibernia contends that the first two conditions in this case were not satisfied.
 
 
 17
 Focusing on the language of the statute requiring payment of wages to a seaman "within two days after the termination of the agreement under which he was shipped," Hibernia contends that each seaman must have signed an agreement before he is entitled to receive penalty wages for non-payment. According to the bank, the agreement contemplated by this statute is that specified in 46 U.S.C.A. Sec. 563, or 46 U.S.C.A. Sec. 564, which requires the master of every vessel making certain voyages to execute "shipping articles" with every crew member prior to making the voyage. Hibernia points out that none of the crew members aboard the M/V CARMEN A had signed an individual agreement that conformed to the requirements of 46 U.S.C.A. Sec. 563 or Sec. 564, and urges that we reverse the award of penalty wages for this reason. We disagree.
 
 
 18
 As an initial matter, we note that we have found no cases supporting the proposition that a seaman claiming penalty wages must have signed articles conforming to the requirements of 46 U.S.C.A. Secs. 563 or 564. Ktistakis v. Liberian SS STAR, 304 F.2d 356 (4th Cir.1962), cited by the bank, lends no support to its position. Ktistakis involved efforts by a foreign seaman aboard a foreign vessel to have articles declared void for failure to comply with the provisions of 46 U.S.C.A. Sec. 564.[7] The Fourth Circuit refused, holding that 46 U.S.C.A. Sec. 564, by its very terms, applies only to American-owned vessels. 304 F.2d at 358. The court in no way intimated that signed articles were a prerequisite to the recovery of penalty wages; indeed, the court observed that the penalty wage statute applied to foreign seamen aboard foreign vessels even though they were not required to sign articles as prescribed by 46 U.S.C.A. Sec. 564. Id. at 358-59.
 
 
 19
 Moreover, we note that the purpose of the signed articles requirement is to protect the seaman. Southern SS Co. v. N.L.R.B., 120 F.2d 505, 508 (3d Cir.1941), reversed on other grounds, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246. The Supreme Court has recognized that the absence of a signed agreement does not defeat a seaman's right to wages, but rather allows a seaman to recover the highest wages paid at the port of embarkation and subjects the master who took him on board to certain penalties. Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 890 n. 4, 6 L.Ed.2d 56 (1961); see 46 U.S.C.A. Secs. 564, 578. The Kossick Court also recognized the enforceability of oral contracts for hire in maritime law. Id. It would be anomalous, then, to conclude that a seaman who was not party to written articles automatically forfeits his entitlement to penalty wages. Accordingly, we hold that the crew members' failure to execute individual agreements with the vessel owner does not prohibit an award of penalty wages.
 
 
 20
 Turning to the second requirement advanced by Hibernia, the bank observes that the crew in this instance served aboard the vessel while it remained in the port of Mobile. The penalty wage statute, it argues, sets forth the timing for wage payment according to the kind of voyage made. According to Hibernia, the members of this crew, having neither commenced nor completed any voyage, have not fulfilled an essential prerequisite to recovery of penalty wages.
 
 
 21
 The bank derives some support for its position from Pacific Mail SS Co. v. Schmidt, 241 U.S. 245, 36 S.Ct. 581, 60 L.Ed. 982 (1916), in which the court held that penalty wages ceased accruing upon entry of the district court's judgment in favor of a seaman claiming disputed wages, despite the vessel owner's continued withholding of payment while pursuing an appeal, because payment of the wages would not have been accepted by the court without payment of the penalty. In holding that the vessel owner's withholding of wages after the court's judgment was not "without sufficient cause," because the vessel owner sought to resolve on appeal "doubtful questions of law and fact" as to the applicability of the penalty, the Court initially observed that it was unclear whether the district court was justified in applying the statute to the facts before it. The seaman in that case had ended his voyage, his articles had terminated, and he received his wages. He remained aboard the vessel for one week, however, while it was in port, hoping to sign new articles. He brought the lawsuit to recover his week's wages.[8] The Court observed that the "statute deals with voyages" and "[i]t seems to us a very strong thing to say that any fair construction of the facts brings the case within the act." 36 S.Ct. at 582. Nonetheless, the writ of certiorari had not been granted on that issue, and the Court proceeded without further discussion on the point.
 
 
 22
 Relying on this dictum, the Fourth Circuit denied penalty wages to a seaman who had decided to stay aboard a vessel after it arrived in port, hoping to sign new articles, but who became ill one day later. Eaton v. SS EXPORT CHALLENGER, 376 F.2d 725 (4th Cir.1967). As in Pacific Mail, the seaman had received payment for his service aboard the vessel under the signed articles, which terminated upon the vessel's arrival. There was, however, a delay in payment of the wages for the day the seaman became ill. The court held that the penalty wage statute was not applicable to work performed on "port time"--"when a vessel is tied up in the interim between the completion of one voyage and the commencement of another and when articles are neither in fact signed nor required." 376 F.2d at 727. See also Compton v. Alton SS Co., 608 F.2d 96, 101 (4th Cir.1979) (vessel owner not subject to penalty wage statute for failure to pay amount due seaman under collective bargaining agreement for six-day period between voyages, while ship was being repaired in port).
 
 
 23
 There are no cases binding on us that hold that the penalty wage statute requires a completed voyage, or that discuss the Fourth Circuit's "port time" doctrine. In at least one case, however, penalty wages were assessed in favor of a seaman who signed a one-year contract to serve aboard a vessel, but whose wages were earned while the vessel remained in port. Griffin v. Oceanic Contractors, 664 F.2d 36 (5th Cir.1981), reversed on other grounds, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). In another instance, the former Fifth Circuit affirmed an award of penalty wages in favor of two seamen who signed one-year agreements to serve with a ship, joined the ship in Pascagoula, Mississippi while it was being repaired, travelled with the vessel from Pascagoula to Mobile, where it was to dry-dock for repairs, and continued to perform their duties while the ship was being repaired in Mobile until their discharge. Caribbean Federation Lines v. Dahl, 315 F.2d 370 (5th Cir.), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963).[9] In affirming the award of fees, the court was aware that the vessel never made a cargo voyage. Nonetheless, the court concluded that the seamen's contracts, which bound them to the vessel wherever it might go for one year, brought them within the provisions of 46 U.S.C.A. Sec. 596. 315 F.2d at 373.
 
 
 24
 It is true, of course, that neither case explicitly rejects the port-time doctrine or a voyage requirement. Like the crewmen in Dahl and Griffin, however, the crew in the instant case served aboard the vessel under the terms of a contract.[10] This contract bound the crew to the vessel for a one-year period, during which time they would be required to go with the vessel wherever it might go. Accordingly, we think that these crew members were entitled to payment under the terms of 46 U.S.C.A. Sec. 596.
 
 
 25
 Although the statute does call for payments to be made at a certain time, depending on the kind of voyage, nothing in the statute mandates that the vessel commence and complete a voyage in which the seaman participated before the seaman is entitled to penalty wages. If Congress had intended to impose a voyage requirement, it could have chosen clearer language than it did. The purpose of the statute would hardly be furthered by our imposing such a requirement, and we decline to do so. In the present case, the wages that were earned over a three-month period were withheld, placing the crew members in the position of having to sue to obtain them. Indeed they were also required to leave the vessel before payment was made. Accordingly, we hold that the fact that the crew did not participate in an actual voyage does not prohibit the members from collecting penalty wages.
 
 
 26
 We think our position is reconcilable with the Fourth Circuit's cases decided under the port-time doctrine. The court below found that the crew's service aboard the M/V CARMEN A was governed by the terms of an employment contract. Although it was not executed individually by the crew members, it was nonetheless a contract. Both Compton and Eaton involved seamen whose service aboard a vessel had terminated according to their signed articles. Both had been paid wages due under the terms of their articles, and both had claimed additional amounts due for periods not covered by any agreement calling for the service aboard a vessel. Hence, even assuming we were to adopt the port-time doctrine, it would not apply to this case.
 
 
 27
 III. WHETHER THE COURT ERRED IN HOLDING THAT E.F.D. AND
 
 DEUTSCH WERE RESPONSIBLE FOR THE PENALTY WAGES
 
 28
 The court below ruled that the contract for the sale of the vessel required E.F.D. and Deutsch to indemnify Hibernia for all inscription costs, including the penalty wages assessed in the crew's favor. E.F.D. and Deutsch contend that allowing the vessel's owner to shift the effect of the penalty wage statute violates public policy. Accordingly, they argue that Hibernia should be responsible for the payment of the penalty. Hibernia does not respond directly to this argument, but insists that E.F.D. and Deutsch agreed to pay all inscription costs, and contends that this provision should be enforced.[11]
 
 
 29
 Section 178 of the Restatement (Second) of Contracts (1979), provides:
 
 
 30
 A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against enforcement of such terms.
 
 
 31
 Section 179 of the Restatement states that public policy against "the enforcement of promises or other terms may be derived by the court from ... legislation relevant to such a policy...." As previously mentioned, the penalty wage statute was intended as a means of ensuring prompt payment of wages to discharged seamen. Collie v. Fergusson, 281 U.S. 52, 55, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930). Imposition of liability is by no means purely compensatory. The coercive effect of the statute is designed to prevent arbitrary refusals to pay wages. Griffin v. Oceanic Contractors Inc., 458 U.S. 564, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982); Swain v. Isthmian Lines Inc., 360 F.2d 81 (3d Cir.1966). As the Supreme Court stated in Griffin, "although the sure purpose of the statute is remedial, Congress has chosen to secure that purpose through the use of potentially punitive sanctions designed to deter negligent or arbitrary delays in payment." 458 U.S. at 572, 102 S.Ct. at 3250. Indeed, the Griffin Court recognized that the statute could authorize an enormous windfall to seamen but observed that the very nature of punitive remedies is to allow awards that may be out of proportion to actual injury. Id.
 
 
 32
 The statute itself speaks in terms of assessing penalty wages against only a vessel owner or a master, and a case decided by the new Fifth Circuit involving the statute has so interpreted it. See Caldwell v. Solus Ocean Systems, 734 F.2d 1121, 1123 and n. 3 (5th Cir.1984) (holding that a crew member has no cause of action under section 596 against the charterer of a vessel who is neither the owner nor the master of the vessel, and noting that neither the briefs nor independent research had divulged any cases imposing section 596 penalty wages on any person other than an owner or master), cert. denied, --- U.S. ----, 105 S.Ct. 434, 83 L.Ed.2d 360. Cf. International Paint Co. v. M/V MISSION VIKING, 637 F.2d 382, 385 (5th Cir. Unit B 1981) (holding that crew members employed and paid by an independent contractor have a preferred maritime lien for the wages against the vessel on which they serve; otherwise a shipowner could circumvent traditional protections afforded seamen by procuring their services through independent contractors).
 
 
 33
 In our view allowing a shipowner to avoid penalty wages liability through a contract would contravene the public policy implicit in the statute.
 
 
 34
 The coercive nature of the statute on vessel owners could be lessened if we were to allow indemnification for penalty wages. The purpose of the provision is to ensure prompt payment of wages by a vessel owner or master. If the master or owner is not the crew's employer, indemnification can be sought for wages tendered. In the meantime, the crew members, who have expended their efforts serving aboard the vessel, are entitled to be paid. Of course, it could be argued that so long as there is a coercive effect on someone, be it the vessel owner or master, or an indemnitor, prompt payment can be assured. Congress, however, has placed the onus on a vessel owner or master, once a demand has been made, to insure prompt payment. Whatever steps an owner or master takes thereafter to be reimbursed is of no importance to the crew.
 
 
 35
 Although it is not certain that Congress foresaw this precise situation when enacting section 596, the circumstances surrounding this case evidence the importance of refusing to allow a vessel owner to shift responsibility for penalty wages. The crew served aboard the vessel for over two months without being paid, through no fault of their own; the dispute was between the parties to the contract for the sale of the vessel over who would pay the wages. Hibernia paid a substantial portion of the inscription costs on the vessel, apparently with the belief that the purchaser would indemnify them for these amounts, yet it withheld the crew's wages, even though repairs to the vessel performed by the crew accrued to Hibernia's benefit. Accordingly, we hold that the court below erred to the extent that it required E.F.D. and Deutsch to indemnify Hibernia for the penalty wages.
 
 IV. WHEN THE PENALTY SHOULD STOP ACCRUING
 
 36
 In Griffin v. Oceanic Contractors, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), the Supreme Court held that courts are not vested with discretion to limit the period during which penalty wages are assessed. The petitioner in that case brought suit for $412.20 in unpaid wages. The district court awarded the wages and penalty wages to petitioner, but halted the accrual of penalty wages at the date of petitioner's new employment, even though he had not been paid at the time, and was not paid until after the district court entered judgment, over four years later. Writing for the Court, Justice Rehnquist recognized that "[i]t is highly probable that respondent is correct in its contention that a recovery in excess of $300,000 in this case greatly exceeds any actual injury suffered by petitioner as a result of respondent's delay in paying his wages," but observed that the "remedy for any dissatisfaction with the results of particular cases lies with Congress and not with this Court." 458 U.S. at 575-76, 102 S.Ct. at 3252.
 
 
 37
 After citing Griffin for this proposition, the court below found that payment was withheld without sufficient cause, but nonetheless stopped the accrual of penalty wages as of February 8, 1983, the day trial began. Both the crew and Hibernia contend that the court selected the wrong date. In their brief, the crew members urged that because the wages were still unpaid, the penalty continued to accumulate.[12] Hibernia argues that any penalty should be assessed only until November 17, 1981, when it filed an undertaking with the court, in order to secure release of the M/V CARMEN A, obligating itself to be bound in an amount up to $400,000 if it were adjudged liable on the claims filed against it. Hibernia draws support for its position from Swain v. Isthmian Lines, Inc., 360 F.2d 81 (3d Cir.1966) in which the court observed in dicta that a vessel owner can terminate the running of the penalty once suit has been filed by depositing the allegedly unlawfully withheld wages with the court. Id. at 88 n. 26; see also Southern Cross SS Co. v. Firipis, 285 F.2d 651, 659-60 (4th Cir.1960) (district court did not abuse its discretion by requiring vessel owner to deposit earned wages and penalty wages with the court in order to prevent further accumulation of penalties on appeal), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961). The Griffin court noted this approach after observing that under its construction of the statute, entry of judgment will not toll the penalty period unless further delays are explained by sufficient cause. 458 U.S. at 575 n. 9, 102 S.Ct. at 3252 n. 9.
 
 
 38
 We decline to follow the Third Circuit's suggestion. The statute clearly dictates that the master or owner "shall pay to the seaman" the double wages "for each and every day payment is delayed," if the failure to pay is "without sufficient cause." 46 U.S.C.A. Sec. 596. If sufficient cause does not exist, the vessel owner must make the payment as prescribed by the statute. Although this may place a vessel owner in a difficult position, that is precisely the statute's intent. A vessel owner who refuses to tender wages and who forces a seaman to institute a lawsuit to recover the amount claimed risks having a court find that he withheld wages without sufficient cause, thereby subjecting himself to penalty wage liability. The Swain court recognized that "it is precisely the possibility that large penalties will accrue that should motivate a shipowner to exercise care in computing wages due a seaman." 360 F.2d at 87. Appellant's suggestion would allow a vessel owner whose position borders on the frivolous to continue to litigate and withhold wages without fear of an increased penalty. Nothing in the language of the statute, or the underlying policies, supports this.
 
 
 39
 The Third Circuit apparently was concerned that a seaman might purposefully delay prosecuting his suit once it is filed to allow further accumulation of penalties. 360 F.2d at 88 n. 26. We in no way sanction such conduct. Federal Rule of Civil Procedure 41(b), however, provides a method for dealing with such actions, and such a concern does not warrant ignoring the language of the statute.
 
 
 40
 Moreover, we note that Hibernia posted the undertaking in order to secure release of the vessel, which had been seized with the commencement of this litigation. We can discern no reason why this action should have tolled the penalty wage statute, nor have we found any authority to support such a proposition.
 
 
 41
 Turning to the crew members' contention that the district court erred in prohibiting further accrual beyond the date of trial, we agree that the accrual of the penalty should stop only when the wages are paid. The statute does not make imposition of the penalty a discretionary matter, and the court below held that Hibernia's actions were without sufficient cause. Accordingly we vacate that portion of the court's judgment limiting the penalty wages and remand for reassessment of the penalty to include accrual of the penalty wages up until the date of payment.
 
 
 42
 V. WHETHER DEUTSCH IS PERSONALLY LIABLE UNDER THE CONTRACT
 
 
 43
 Deutsch contends that the contract to sell the vessel, pursuant to which the court below ordered that E.F.D. and Deutsch indemnify Hibernia for all inscription costs, was entered into by E.F.D. as a separate entity. Hence, according to Deutsch he is not liable in his individual capacity. On a related issue, Deutsch challenges the district court's admission of parol evidence when the agreement contained an integration clause.
 
 
 44
 We first address the parol evidence question. Parol evidence is admissible to explain an ambiguity in a contract when such explanation is not inconsistent with the written terms. Scafidi v. Johnson, 420 So.2d 1113, 1115 (La.1982). The court below admitted testimony from Capouch that at the time the contract was executed, he requested that Deutsch sign the contract in his individual capacity. Deutsch did in fact sign the document twice--once as president of E.F.D. and once individually. Deutsch explains his individual signature by stating that his role in the contract as guarantor of the purchase price is spelled out, but that in no way did he intend to become individually responsible for any other matter. Indeed, the contract lists only E.F.D. as purchaser. We cannot say, however, that admission of Deutsch's testimony was erroneous. Deutsch's signature could be viewed as holding himself individually responsible under the contract. Accordingly, we cannot say it was an abuse of discretion to admit the evidence. Nor can we say that the district court was clearly erroneous in finding that Deutsch agreed to become a party to the agreement.
 
 
 45
 VI. WHETHER THE LIQUIDATED DAMAGES PROVISION SHOULD HAVE BEEN ENFORCED
 
 
 46
 The contract for the sale of the M/V CARMEN A contained a liquidated damages provision allowing Hibernia to retain the $50,000 deposit. Nonetheless, the district court refused to enforce the provision, holding that the agreement to pay the inscription costs was separate from the balance of the contract, and that allowing E.F.D. and Deutsch to so enforce the provision would be unconscionable. In addition, the court concluded that principles of equitable estoppel should apply to disallow enforcement of that provision.
 
 
 47
 E.F.D. and Deutsch attack all three conclusions, arguing that their liability should be limited to the $50,000 deposit described in the contract as liquidated damages. They argue that the district court erred in finding that the liquidated damages provision related only to ensure Hibernia the benefit of its bargain, and in finding that the agreement to pay the inscription costs was a separate provision. As an initial matter, we note that this is an unusual claim--most litigation of liquidated damages provisions involves claims by the breaching party that a clause should not be enforced because the agreed upon damages are excessive. Here, E.F.D. and Deutsch argue that the payment of the liquidated sum should allow them to escape their obligation under the contract. The presence of a liquidated damages provision in a contract is not ordinarily construed in such a fashion. See Restatement (Second) of Contracts Sec. 361 Comment a (1979) ("Merely by providing for liquidated damages, the parties are not taken to have fixed a price to be paid for the privilege not to perform.").
 
 
 48
 In any event, we cannot say that the district court's findings that the liquidated damages provision was independent of the agreement to pay all inscription costs, and that the buyer agreed to pay inscription costs even if he did not go through with the contract, are clearly erroneous. The contract itself is ambiguous and the evidence before the district court was conflicting. Accordingly, we affirm the district court's decision to refuse to limit E.F.D.'s and Deutsch's liability to forfeiture of the $50,000 deposit. We do note, however, that Hibernia is entitled to reimbursement for inscription expenses only to the extent that they exceed the liquidated sum. Because of our holding we need not discuss the court's refusal to enforce the liquidated damages provision on grounds of unconscionability and equitable estoppel.
 
 VII. LIABILITY FOR POST-SEIZURE WAGES
 
 49
 After the vessel was arrested at the commencement of this litigation, the crew stayed aboard the vessel. The court below found that Hibernia permitted this, after initially demanding their removal, at Hanseung's request, in the event that a prospective purchaser might want to employ them. In addition, the court found that they had no where else to live. The court noted that, absent special circumstances, a crew member has no lien against a vessel for post-seizure wages. See Gilmore & Black, The Law of Admiralty, 605-06 (1975). Observing that at the time of the seizure the crew was aware that the contract for sale of the vessel had been severed, the court concluded that any post-seizure work performed could not have been expressly or impliedly authorized so as to bind the vessel; in addition, the court noted that Hibernia had hired a guard to watch the vessel following seizure, so that this was not a service the crew was performing. Thus, no special circumstances existed and no lien against the vessel for post-seizure wages was awarded. Nonetheless, the court awarded the crew members their basic allotment for the period they remained aboard the M/V CARMEN A, ordering that Mardikos and Overseas were liable for this amount.
 
 
 50
 Overseas and Mardikos assert that the district court was incorrect in imposing liability on them for post-seizure wages. First, they contend that crew members have a lien against the vessel in whose service they labor regardless of the identity of the employer. International Paint Co. v. M/V MISSION VIKING, 637 F.2d 382 (5th Cir. Unit B 1981). The district court was correct, however, in observing that ordinarily no lien arises against a vessel for post-seizure wages and Mardikos and Overseas do not challenge the court's finding that there were no special circumstances that would warrant creation of the lien in this instance. Mardikos and Overseas next contend that although Overseas did sign the contract that employed the crew, it did so only as agent for the vessel. It is true that one who acts in the capacity of an agent for a disclosed principle is not liable for claims arising out of a contract executed by the agent on behalf of the principle. Lake City Stevedores v. East West Shipping Agencies, 474 F.2d 1060, 1063 (5th Cir.1973). The court below made no specific findings or conclusions as to whether Mardikos was acting in an agency capacity at the time, and if so, for whom, or whether the agency relationship ended, and what effect, if any, that would have on the liability of Overseas. In addition, the court never explained why Mardikos should be individually liable for this amount. Because this portion of the court's decision is unclear, we vacate the award as against Mardikos and remand for further consideration.
 
 VIII. THE CREW'S TRANSPORTATION EXPENSES
 
 51
 Hanseung, which is not a party to this appeal, sought reimbursement of the costs it incurred when it advanced the crew members' air fare from Mobile to Korea. The district court held that Hanseung had a lien against the M/V CARMEN A for this and other amounts. One day after issuing its amended findings and conclusions, the court entered judgment in favor of Hibernia and against Overseas in the amount of $16,399, the amount Hanseung paid to bring the crew members back to Korea. No explanation accompanies this entry of judgment, and we are unable to discern its basis from the court's finding. Accordingly, we vacate that portion of the judgment and remand for findings on this issue.
 
 
 52
 IX. WHETHER DEUTSCH IS INDIVIDUALLY RESPONSIBLE FOR REPAYING
 
 MARDIKOS' DEPOSIT
 
 53
 The court ordered Deutsch to return the $20,000 retained from Mardikos' $100,000 deposit. Deutsch does not dispute this amount is owed to Mardikos, but he contends that the $100,000 was advanced to E.F.D., the $80,000 returned was paid by E.F.D., and that E.F.D. alone is responsible for paying the remaining $20,000. The evidence before the district court as to who was responsible for refunding the deposit was conflicting. The court heard considerable testimony on this matter, and we cannot say its decision to order Deutsch to return the $20,000 was clearly erroneous.
 
 
 54
 X. WHETHER THE COURT SHOULD HAVE AWARDED PREJUDGMENT INTEREST
 
 
 55
 In entering judgment, the district court awarded prejudgment interest on numerous claims, but did not order that Overseas receive prejudgment interest on the $20,000 award from Deutsch. Overseas and Mardikos contend that the court abused its discretion in failing to make this award.
 
 
 56
 Although an admiralty court has discretion to grant or deny prejudgment interest, the general rule in admiralty cases is that prejudgment interest should be awarded absent peculiar circumstances. Miller Industries v. Caterpillar Tractor Co., 733 F.2d 813, 822 (11th Cir.1984); Dow Chemical Co. v. M/V GULF SEAS, 593 F.2d 613, 614 (5th Cir.1979). And, although most of this circuit's authority on the subject addresses the propriety of prejudgment interest in tort cases, it is equally appropriate in a breach of contract action. International Paint Co. v. M/V MISSION VIKING, 637 F.2d 382, 386 (5th Cir. Unit B 1981). Prejudgment interest is not a penalty, but rather is in the nature of compensation for the use of funds. Socony Mobil Oil Co. v. Texas Coastal and International Inc., 559 F.2d 1008, 1014 (5th Cir.1977).
 
 
 57
 Here the court offered no explanation why it did not award prejudgment interest on the $20,000 sum. Without any explanation, we cannot determine whether peculiar circumstances were applicable in this instance. Accordingly, we remand the issue to the district court to make this determination in the first instance.
 
 
 58
 AFFIRMED in part, REVERSED in part and REMANDED in part.
 
 
 
 *
 Honorable Eugene A. Wright, U.S. Circuit Judge for the Ninth Circuit, sitting by designation
 
 
 [1]
 During the course of the events surrounding this litigation, the vessel's name was changed to THE M/V BEAVER SPIRIT. To avoid any unnecessary confusion, we will refer to the ship as the M/V CARMEN A
 
 
 [2]
 Since the time that the claims involved in this case have matured, Congress has repealed 46 U.S.C.A. Sec. 596, and other statutes involved in this case, as part of a comprehensive reorganization and recodification of the shipping code. See Act of August 26, 1983, Pub.L. No. 98-89, Sec. 4(b), 97 Stat. 500. Under the terms of the repealing statute, however, this case is still governed by old section 596 since the claim involved here matured prior to the passage of the repealing statute. In future cases, penalty wage claims will be governed by 46 U.S.C.A. Sec. 10313
 
 
 [3]
 Overseas had partially reimbursed Hanseung for these expenses in August of 1981
 
 
 [4]
 Hibernia increased its undertaking to $782,181, in order to obtain a stay of the district court's judgment pending appeal
 
 
 [5]
 There were other parties to the litigation in the district court who are not parties to this appeal
 
 
 [6]
 The statute reads in full:
 The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in a manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters who are owners of any vessel the seamen of which are entitled to a share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts.
 
 
 [7]
 The seaman apparently sought to invoke the penalty provisions of 46 U.S.C.A. Sec. 575, which provides that if a master shall carry out a seaman without signed articles, he shall pay to such seaman the highest wages which shall have been given at such port within three months next before the time of such shipping, and 46 U.S.C.A. Sec. 578, which provides that shipments made contrary to any act of Congress shall be void, and a seaman so shipped may leave the service at any time and shall be entitled to recover the highest rate of wages of the port from which he shipped
 
 
 [8]
 After one week, the seaman was discharged. His demand for his week's wages was refused because of a dispute over some missing silverware
 
 
 [9]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [10]
 The court below found that the agreement signed by Hanseung and Overseas was the contract by which the crew was employed. The court also found that Hibernia had accepted the benefits of Mardikos as its agent and agent for the vessel throughout the transaction thereby requiring it to stand liable as principal for debts incurred by the agents. Hibernia challenges neither of these findings on appeal, but does argue that the contract was conditional upon sale of the vessel. This condition, however, was quite obviously waived by the conduct of the parties
 
 
 [11]
 None of the parties make any suggestion as to whose public policy we should consider, although the contract contains a choice of law provision stating that Louisiana law should be applied to construe the agreement. Nonetheless, the underlying claim in this case is not based on the contract, but is a claim within the court's admiralty jurisdiction for wages due. Part of the claim is a request for penalty wages made under a federal statute. Accordingly the case is governed by federal law and not by Louisiana contract law
 
 
 [12]
 At oral argument, the crew conceded that payment of their wages just prior to oral argument tolled the penalty as of the date of payment