541 So.2d 322 (1989)
J.C. LaCAZE, et ux., Plaintiff-Appellee,
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 87-861.
Court of Appeal of Louisiana, Third Circuit.
March 29, 1989.
Rehearing Denied May 4, 1989.
Writs Denied June 30, 1989.
*323 Bertrand & Soileau, Ronald J. Bertrand, Rayne, for plaintiff-appellant.
Thomas & Dunahoe, Edwin Dunahoe, Natchitoches, for defendant-appellee.
Before DOUCET, YELVERTON and KING, JJ.
KING, Judge.
The sole issue presented by this appeal is whether or not the trial court was correct in rescinding an act of sale for fraud and/or misrepresentation.
J.C. LaCaze and his wife, Ernestine Breville LaCaze, (hereinafter the LaCazes) the owners of land in Natchitoches Parish, Louisiana, conveyed the ownership of a 23.715 strip of their land to the State of Louisiana, Department of Transportation and Development (hereinafter the State), for the construction of Interstate Highway 49. The act of sale recited that the consideration paid was $22,529.00 and that it was for the property conveyed and any diminution in the value of the LeCazes' remaining property.
The sale occurred in May, 1983. Eight months later, in February 1984, the LaCazes sued the State to declare the act of sale a nullity, claiming that their signatures to the sale were induced by misrepresentation and assertions by the State leading them to believe that they were not giving up the right to claim severance damages. Alternatively, they pleaded lesion beyond moiety. After a trial the district court, finding fraud and misrepresentation by the State, rendered judgment annulling and setting the sale aside. The trial court never reached the lesion issue. The State appealed. We affirm.
FACTS
The trial judge made the following finding of fact which we quote:
"They [Mr. and Mrs. LaCaze] were told by the agents that the purpose of the deed was only to purchase the land and their rights to severance damages would remain and have to be handled by another department"
The trial court then stated that what the State's agents told the LaCazes was not true, because the third page of the four page deed contained this paragraph:
"Vendor acknowledges and agrees that the consideration provided herein constitutes full and final payment of the property hereby conveyed and for any and all diminution in the value of the vendor's remaining property as a result of the transfer of this property for highway purposes."
The trial court concluded, citing former La.C.C. Art. 1847 (1870), that the "plaintiffs were deceived and defrauded by the State's agents as a result of false assertions as to a material part of the contract and that under the existing law this vitiates the contract".
During 1983 the State was acquiring land through Natchitoches Parish, Louisiana for construction of Interstate 49. Some land was acquired by amicable purchase and some by expropriation. The present case involved an amicable purchase. The State based its offers to purchase on real estate appraisals obtained for that purpose. In the present case the State asked James C. McNew for an appraisal before the acquisition of the LaCaze property.
McNew, a member of the American Institute of Real Estate Appraisers, testified *324 that he appraised the LaCaze property in April 1983. According to his trial testimony and his report, which was filed in evidence, the entire LaCaze tract before the sale consisted of 114.7 acres of pastureland and timber. The tract had no building improvements and no utilities. It was in the shape of a narrow triangle. It did not have any frontage on a public road and was accessible only by a private road that crossed a quarter of a mile over property of an adjacent owner, Weaver. The LaCaze land purchased by the State for the route of I-49 left 57.95 acres of LaCaze property on one side and 33.11 acres of LaCaze property on the other side. The 33.11 acres that was detached, by the strip sold, lay across the base of the triangle. It was landlocked in terms of the access that was previously enjoyed across abutting ownership, that road now giving access only to the 57.95 acres of LaCaze on the other side of the strip sold to the State. However, McNew concluded that the 33.11 acres portion was no more landlocked after the purchase than it was before, in the sense that the property had always required access across the lands of another. Mr. McNew's opinion was that the highest and best use of the 33.11 acres was for timber. Access was still available through a log road from the public road, although across the land of still another neighbor. He found that the subject property did not suffer any severance damages due to the taking and proposed construction of I-49. His expert opinion was that the landlocked 33.11 acre remainder was for timberland and no discount should be applicable for that type of land use without road frontage. He explained these conclusions in his report. He did not think much of the importance of access to timberland because this property was cut-over land and it would retain its potential, according to him, with the only change being the direction of access for management and harvest of the timber. Mr. McNew made a study of the local market to determine sales and rentals of landlocked tracts for farm use and it was his conclusion, after his analysis, that timberland is not typically discounted for not having access.
McNew's appraisal report to the State in April 1983 was that the value of the 23.715 acres needed for the right-of-way was $950.00 an acre, or a total of $22,529.00. His report indicated that the two remaining LaCaze tracts would suffer no severance damages and so the recommendation of McNew, as to severance damages, was zero.

I.

The Lesion Issue
The LaCazes argue that they can rescind the sale for lesion beyond moiety. La.C.C. art. 2589 gives this right to a vendor who has been aggrieved for more than half the value of an immovable estate sold by him.
The trial judge never reached this issue. However, the record is before us, the issue was fully litigated below, and we will decide it. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
Two appraisers testified at the trial. For the State there was Mr. McNew who, as previously explained, appraised property before the sale and concluded that the parcel the State bought was worth $950.00 an acre, and that there were no severance damages to the 33.11 acre remainder. R. Stacy Williams appraised the property for trial purposes and testified for the landowners. His opinion was that the land in the right-of-way had a value of $1,360.00 per acre, and that the severance damage to the remaining 33.11 acres amounted to $958.00 an acre.
Using the Williams' appraisal figures, if the severance damage to the remainder can be added to the value of the immovable in the right-of-way, then the value of the LaCaze property, or a total of $63,969.00, was more than twice the $22,529.00 the State paid. If the severance damages may not be included, the difference is the difference between $32,250.00 and $22,529.00, which is less than one-half.
A sale of an incorporeal immovable is not subject to rescission on the grounds of lesion beyond moiety. A vendor's right to recover the diminution in value to his remaining property is an incorporeal *325 immovable. Webb v. State through Dept. of Transp. & Dev., 470 So.2d 994 (La.App. 1 Cir.1985). Accordingly, we cannot consider the evidence of claimed severance damages for purposes of evaluating the claim of lesion beyond moiety. Since we cannot consider it, it is unnecessary for us to determine whether there was, or was not, any actual severance damage to the LaCaze property.
Nor does the dispute as to the value of the immovable in the right-of-way need to be resolved. Even if we were to accept the Williams' appraisal of $1,360.00 per acre as the correct value, the price paid, $950.00, was more than one-half of that value, and the landowners have not met their strict burden of proof of lesion beyond moiety.

II.

The Fraud Issue
It was on the basis of the McNeal appraisal report that the State made its offer to the LaCazes. Its two right-of-way agents, Phillip Poland and Mike Young, were assigned to the matter. They both testified that, in accordance with the usual practice, the first approach to a landowner was by means of a "Fair Market Value Letter", also called a "Just Compensation Letter". They testified that they delivered this letter, a copy of which is in evidence, to the LaCazes. This letter, dated May 18, 1983, contained the offer to purchase. It recited that the land had been appraised for $22,529.00 and that the appraisal reflected zero severance damages. The LaCazes neither admitted nor denied that they received this letter. On rebuttal Mr. LaCaze testified that his wife had searched for it but did not find it. The act of sale the LaCazes signed exactly complied with the terms of the offer contained in this letter.
The negotiations and the actual signing of the sale instrument took place in the LaCaze home. Mrs. LaCaze made coffee while the two agents and Mr. LaCaze discussed the transaction. Mr. LaCaze said this took thirty to forty-five minutes, while Mrs. LaCaze estimated the time at forty-five minutes to an hour.
What transpired at that meeting in the LaCaze home that day is the factual dispute on which the consent issue in the case turns.
There were four people present at the signing of the act of sale. The testimony is not lengthy. We believe that the agents' conduct and what they said can best be related by quoting parts of testimony directly from the record.
The following is pertinent testimony of Phillip Poland, one of the State's agents:
"Q. Do you recall Mr. LaCaze asking you about obtaining more money for damages?
A. That.... I believe he did, but that's the point where I mentioned earlier that if that was the problem he needed to see an attorney about that, that I was not an appraiser, that, you know, he would need to seek legal counsel about that. And that if that's the way he felt, naturally he shouldn't sign the document that I had there until he was satisfied."
We quote now the pertinent testimony of Mr. LaCaze:
"Q. Okay, and how did these people, whoever they were, how did they identify themselves as to who they were or who they represented?
A. At this particular time?
Q. Yes, sir.
A. They came in and wanted to talk to me about paying me for the right-of-way that went across my property.
Q. Okay.
A. And my wife.... we sat down at the table and my wife made coffee and we talked it over and they offered me nine hundred and fifty dollars ($950.00) an acre for the twenty-two some point acres we had that they took.
Q. Okay. This instrument describes twenty-three, point, seven, one, five (23.715) acres. Is that what you.... would it coincide with what you remember about the amount of land within the right-of-way.

*326 A. That's right.
Q. And they offered what? The figure was twenty-two thousand five hundred and twenty-nine dollars ($22,529.00) for that land?
A. That's what I got a check for.
Q. Alright, what else was discussed at that time?
A. Well, I asked these.... I asked this man.... he says he would give me nine hundred and fifty dollars ($950.00) an acre."
[OBJECTION, DISCUSSION, RULING]
"Q. When the representatives of the State.... and I'll call them for lack of going through the State of Louisiana, Transportation, etcetera, you'll know who I'm talking about.... when these representatives of the State came to your home were there any representations made to you concerning what effect your signing of this instrument, P-2, would have as to your claim for damages to your thirty-three (33) acres of land that was going to be landlocked after the interstate came through?"
[OBJECTION, DISCUSSION, RULING]
"Q. "You understand my question?
A. Come again with it.
Q. You want me to say that whole....
A. Yeah.
Q. Okay, when this instrument was presented to you by representatives of the State, P-2, were there any representations made to you concerning what effect your signing of this instrument would have on your claiming damages for having thirty-three (33) acres of land landlocked after the interstate came through your property?
A. Well, this man, when he asked me to sign this piece of paper, I asked him before I signed it, `What about my thirty-three (33) acres?' This man told me that I would have [to] see someone else besides him, that he was a right-of-way buyer and not.... he couldn't tell me anything about my land I was losing. Now that's the only reason that my wife and I signed that, because he told us that I would have to see someone else, that he couldn't answer my question, that he didn't have anything to do with the thirty-three acres we lost. He was a right-of-way buyer.
Q. That's what he told you?
A. That's what he told me.
Q. Said you have to check with somebody else about that?
A. That's right.
Q. Did you understand that by executing this instrument P-2 that you were giving up any claim to assert.... or any claim for damages for having your property landlocked?
A. No, if I.... if.... he should have told me if I was giving it up.... he owned (sic) me nine hundred and fifty dollars ($950.00) an acre for twenty-two and some acres and I got sense to know that nine hundred dollars and the money he gave me wasn't going to buy fifty some acres.
Q. How much of your land is landlocked?
A. Thirty-three point something acres.
Q. You have any way to get to it?
A. No, sir.
Q. Have you had any way to get to it since the interstate has come through there?
A. No, sir, it's gone.
Q. Did the gentleman from the State bring P-2 with him at the time he came to your home? Did he already have this document fixed up?
A. It was all fixed up and he just laid it out there and we signed it. Q. Did he read through it with you?
A. No he didn't.
Q. Did he suggest to you that you need to read through it?
A. No he didn't.
*327 Q. How long was the total amount of time that he was in your home? How long did this whole transaction take, Mr. LaCaze?
A. Long enough for my wife making coffee and sit there and chat with him for thirty or forty-five minutes."
Q. If you had known that this instrument contained a clause that by executing it you were giving up I believe as it says it constitutes full and final payment for the property herein conveyed and for any and all diminution in value of the vendor, that's you, remaining property as a result of the transfer of this property for highway purposes. Let me ask you, do you understand what that means?
A. Sure.
A. Okay. If you had known that that was in there would you have executed this instrument?
A. No, I asked the man before I signed the thing."
The other state agent, Mike Young, testified:
"Q. The day that the LaCazes signed the sale document do you recall going to their residence.
A. Yes, sir.
Q. Do you recall meeting the LaCazes?
A. Yes, sir.
Q. Do you recall seeing Mr. LaCaze examine the sale document?
A. Yes, sir.
Q. Did it take him a while to do it?
A. Yes, sir.... I'd say ten minutes.
Q. What was he doing during that ten minutes?
A. He was just.... he was sitting at the table reading through the document."
The testimony of Mrs. LaCaze was this:
"Q. And would you tell the Court please what was stated by the representative of the State in response to you all's questions about what effect this instrument would have on claiming severance damages to your other thirty-three acres of land?
A. Well they just said to sign the paper, that we'd have to see, you know, someone else because they didn't do that. All they was there was for us to sign those papers to....
Q. Did they indicate to you that what you were giving up was anything more than just the pure right-of-way land?
A. No. No, uh-uh.
Q. Did they tell you anything about well when you sign this and we're going to be through with you completely, we're not going to pay you for anything else.
A. Um-um. No.
Q. And if I understood you right, when that question was posed about, `Well, what do we do about our land we can't get to ...
A. Well they just said we'd have to see someone else. We have to talk to....
Q. Did they tell you who?
A. No, they didn't tell us who."
Finally, on rebuttal, Mr. LaCaze testified:
"Q. You heard the testimony of these gentlemen that says you sat there and read the document for ten minutes. Did you do that?
A. No. I gandered at it and I presumed the people was straight people and I signed it.
Q. Did you (sic) wife read it?
A. My wife didn't read it.... didn't look at it like I did. She was making coffee. She just didn't look at the document. She signed it."

OPINION
We recognize that whether a contract should be annulled because fraud or error vitiates the consent of one of the parties is a factual question to be decided by the trial court. Minor v. Robertson, 461 So.2d 509 (La.App. 3 Cir.1984). A trial court's determination *328 of factual issues will not be disturbed on appeal, absent manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Fraud need only be proved by a preponderance of the evidence and it may be established by circumstantial evidence. La.C.C. art. 1957. We cannot say that the trial court was manifestly in error or clearly wrong in finding, based on the evidence in this case, that the LaCazes proved by a preponderance of the evidence that they were deceived and defrauded by the State's agents by false assertions. The trial court's finding of fact that the State's agents told the LaCazes "that the purpose of the deed was only to purchase the land and their rights to severance damages would remain and have to be handled by another department" is not manifestly in error or clearly wrong.
For the foregoing reasons, the judgment of the trial court in favor of the LaCazes and against the State of Louisiana through the Department of Transportation and Development, rescinding the sale of their land to the State is affirmed. All costs of this appeal are taxed to the State.
AFFIRMED.
YELVERTON, J., dissents and assigns reasons.
YELVERTON, Judge, dissenting.
Consent was not vitiated by fraud in this case. The trial court was clearly wrong in the finding that the agents told the LaCazes "that the purpose of the deed was only to purchase the land and their rights to severance damages would remain and have to be handled by another department". The testimony simply does not impute such a declaration to the agents. If the LaCazes got that impression, it was an unreasonable one. It was an inference not justified by this record.
I have read and reread the trial testimony, and LaCaze nowhere says that the agents told him that if he signed the deed he would still have his rights to severance damages. LaCaze seems to be suggesting that he got that impression, and that the agents knew he was under that impression but that they failed to enlighten him. This inference is not a reasonable one. At that point in time, there was but one appraisal, McNew's. Right or wrong, that appraisal declared that there was no severance damage. The conveyancing language in the sale that included the severance damages was a contractual recognition that there was no such damage. The agents could not have believed that they and the State were getting the advantage of the LaCazes. Former C.C. art. 1847, applicable at the time of this case, included in its definition of fraud "error ... created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other". Since the facts known to the agents were that the LaCazes had suffered zero damages, signing the deed could cause neither advantage to the State nor loss to the landowners. Nor is there any evidence that the agents knew or should have known that the LaCazes believed they were retaining their rights to later dispute severance damages.
This was an arms-length business transaction between persons on an equal footing intellectually. LaCaze was not an unsophisticated businessman. He owned extensive property in the Natchitoches area, and had been a dealer, distributor and jobber for a major oil company there for 27 years. He admitted that he had the opportunity to read the contract when on rebuttal he testified that he "gandered at it". We have pointed out above that it makes no sense to believe that the agents were trying to hide the language from him that gave up his severance damage rights. He admitted that he understood that language. Therefore the only reason he was not aware of that language was because he failed to read the contract.
A basic precept of contract law is that a party may not avoid the provisions of a contract he signs but fails to read or have explained to him. St. Landry Loan Company v. Avie, 147 So.2d 725 (La.App. 3rd Cir.1962); Minor v. Robertson, 461 So.2d 509 (La.App. 3rd Cir.1984); Guaranty Bank & Trust Co. v. Jones, 489 So.2d 368 (La.App. 5th Cir.1986). In the present *329 case, if the LaCazes were unaware that they were giving up their right to severance damages, it was not because of fraud or error, it was because they failed to read the contract. I would find clear error in the trial court's determination that fraud vitiated the sellers' consent in this transaction. I would reverse the judgment and dismiss the suit.