611 So.2d 140 (1992)
Angelo DiVINCENTI
v.
Reginald McINTYRE, as curator of the interdict, Phyne Uli (also known as Josephine Marie Uli).
No. 91 CA 0914.
Court of Appeal of Louisiana, First Circuit.
November 4, 1992.
Rehearing Denied January 11, 1993.
Writ Denied March 26, 1993.
George Anding, Jr., Baton Rouge, for plaintiff-appellee.
Patrick Leitz, John Holmes, New Orleans, E. Wade Shows, Baton Rouge, for defendant-appellant.
Rodney Pete McIntyre, Curator.
Before EDWARDS, SHORTESS, LANIER, CRAIN, and WHIPPLE, JJ.
SHORTESS, Judge.
Angelo DiVincenti (plaintiff) and Josephine Marie Uli (defendant) were married on July 3, 1954. In 1958 a marriage contract between plaintiff and defendant dated July 1, 1954, was filed in the records of Tangipahoa Parish. Defendant was interdicted following a stroke in 1984. In 1986 plaintiff filed this declaratory judgment action against Reginald J. McIntyre, defendant's curator, to have the marriage contract declared null and void. The trial court ruled in favor of plaintiff.[1] Defendant, through Rodney P. McIntyre, her present curator (curator), appeals.
The curator contends the trial court erred in finding plaintiff met his burden of proving the marriage contract was invalid. The marriage contract in question was in *141 authentic form, as was required in 1954.[2] An authentic act constitutes full proof of the agreement it contains. La.C.C. art. 1835. Because the authentic act is clothed with a presumption of genuineness, the party attacking the authenticity of the act bears the burden of proving the invalidity. Perry v. Akin, 174 La. 472, 141 So. 32 (1932); Eymard v. Terrebonne, 560 So.2d 887, 889 (La.App. 1st Cir.1990); Comment, Writing Requirements and the Authentic Act in Louisiana: Civil Code Articles 2236, 2275 & 2278, 35 La.L.Rev. 764, 775 (1975).
The law accords a high degree of sanctity to authentic acts. Pierre v. Donaldsonville Motor Co., 22 So.2d 291, 293-294 (La.App.Orl.Cir.1945). The Louisiana Supreme Court explained:
The effect given by law to authentic acts, rests upon the presumption, that a public officer, exercising a high and important trust, under the solemnity of an oath, has done his duty when acting within the scope of his authority. Selected for their character, capacity and probity, as notaries are presumed to be, the law attaches full credit to their official acts. This prerogative is established in the interest of public order, to maintain peace among men, and to prevent contestations concerning the proof or evidence of their conventions.
Succession of Tete, 7 La.Ann. 95, 96 (La. 1852). Consequently, the party seeking to prove the invalidity of the act must present evidence beyond a mere preponderance. In Eymard, this court required "convincing proof" to invalidate an authentic act. 560 So.2d at 889. See also De Blanc v. Martin, 2 Rob.R. 82 (La.1842) ("evidence ... as to leave no reasonable doubt"); Pierre, 22 So.2d at 293-294 ("convincing proof"; "strong proof").
Plaintiff does not dispute the genuineness of the signatures on the matrimonial agreement. The notary, Joseph D. Lupo, and both witnesses identified their signatures. The principal dispute is whether the contract was executed before the marriage, as was required at that time by Civil Code article 2329, or whether the document was antedated by the notary.
The curator introduced the deposition testimony of Lupo and the two witnesses. Neither of the witnesses had specific recall of the events surrounding the execution of the agreement. Lupo, an attorney, had a general recollection of the events surrounding his preparation of the document and the execution thereof by the parties. He testified defendant asked him before her marriage to plaintiff to prepare a marriage contract to maintain the separate nature of property she had owned for many years. He further testified he would never have backdated a document or notarized it without the parties or witnesses being present.
In Pierre, the memories of the notary and a witness were similarly blurred by the passage of time. The court stated:
[T]he instrument itself is in authentic form and the notary states therein that it was executed before him in the presence of the witnesses, who signed their names with the parties to the act, after due reading of the whole. This is sufficient to sustain the validity of the instrument as an authentic act in the absence of convincing proof to the contrary.
22 So.2d at 293. Here, plaintiff presented as "proof to the contrary" his own self-serving testimony denying execution of the agreement before marriage. He also provided the deposition testimony of an Air Force friend, his friend's wife, and certain military records to show he was at Barksdale Air Force Base on July 1, 1954.
Rodney and Reginald McIntyre testified for the defense, in addition to the notary and the witnesses. Both McIntyres testified plaintiff admitted to them that he signed the agreement before the marriage. The McIntyres stated plaintiff told them he signed the agreement because he was being sent overseas by the Air Force and wanted to make things easier for defendant in the event he was killed. Plaintiff denied any such conversations.
*142 The trial court found this case was "a swearing contest between the opposing parties." He then relied on the military records, which he found more impressive than any other testimony or evidence. Based on these records, which showed plaintiff was at Barksdale Air Force Base on the date the matrimonial agreement was allegedly executed, he found the marriage contract null and void.
The trial court committed legal error in finding that unsworn military records (which were simply an extract by a clerk based on sign-in sheets which were not available for review by the parties or the court) carried sufficient evidentiary weight to invalidate an authentic act. Plaintiff has failed to present strong and convincing proof of such magnitude as to overcome the presumption of verity of notarial acts. For these reasons, the judgment of the trial court is reversed. Plaintiff's suit is dismissed, with prejudice, at his cost.
REVERSED AND RENDERED.
CRAIN, J., concurs.
LANIER, J., dissents and assigns reasons.
EDWARDS, J., dissents for the reasons assigned by LANIER, J.
LANIER, Judge, dissenting.
This action is a suit seeking a declaratory judgment that a matrimonial agreement (marriage contract) is null because of fraud. The plaintiff-husband asserted that he was fraudulently induced to execute the marriage contract and, although the marriage contract was dated before the marriage, it was actually executed after the marriage, and, pursuant to the provisions of La.C.C. art. 2329 then in effect, the contract was null. The trial court found as a fact that the marriage contract was not executed on the date specified therein and declared it "absolutely null, void and of no effect whatsoever." This devolutive appeal followed.[1]

FACTS
In July of 1954, Angelo D. DiVincenti was in the United States Air Force (USAF) and was assigned to the Strategic Air Command (SAC) at Barksdale Air Force Base (Barksdale) in Bossier City, Louisiana. At this same time, Josephine Marie Uli (nicknamed Phyne Uli) was living in Independence, Louisiana, where she worked in the post office (and later became postmaster).
At the trial herein, a document purporting to be a matrimonial agreement (marriage contract or antenuptial agreement) between DiVincenti and Uli was filed in evidence. This document (the contract) is dated July 1, 1954, and is in the form of an authentic act. The two witnesses are Sam L. Levatino and Maggie L. Monistere, and the notary is Joseph D. Lupo. The contract provides, in pertinent part, as follows:
ARTICLE I.
That the said intended husband and wife shall be separate in property. Accordingly, they hereby formally renounce the dispositions of the civil law of Louisiana, which establish a community of acquets and gains between husband and wife.
ARTICLE II.
All property and effects of the said intended wife, whether owned by her at the time of the celebration of said intended marriage or acquired during said marriage, are hereby declared to be paraphernal property and she hereby expressly reserves to herself the entire administration of her movable and immovable property and the free enjoyment of her revenues.
ARTICLE III.
It is further stipulated that the said intended wife shall have the right to use her maiden name in all of her future business transactions and her employment *143 and to conduct her said business and employment in said name. The said intended husband states in the event of death, the said intended wife is his one and only legal heir.
The contract was filed in the public records of Tangipahoa Parish on September 12, 1958.
DiVincenti and Uli were married in Magnolia, Mississippi, on July 3, 1954. Uli apparently owned property prior to the marriage, and, after the marriage, she acquired several more pieces of property in her own name. No children were born of the marriage. Apparently, DiVincenti and Uli have never been legally separated or divorced.
In 1972, Uli retired from her job at the post office. In 1983, Uli purportedly wrote an olographic will in a "green book", and in the will she left all of her property to her nephews, Reginald J. McIntyre and Rodney P. McIntyre. In approximately 1984, Uli had a stroke and was interdicted. DiVincenti testified he learned of the matrimonial contract for the first time in 1985. This suit was filed on May 14, 1986.

TESTIMONY OF THE WITNESSES
DiVincenti testified he did not sign the contract on July 1, 1954, and he did not sign it before Lupo, Levatino and Monistere. He admitted that his signature on the contract was genuine, but he said he signed the contract in 1958. He said he was in his yard painting when Uli approached him with the contract and told him it was a "bond" for her position at the post office. He did not read the contract; he just signed it. He stated that had he known the true nature of the contract, he would not have signed it. DiVincenti testified he first learned of the true nature of the contract in 1985, when Reginald (Reggie) McIntyre gave him a copy of it.[2] DiVincenti specifically stated he was at Barksdale from July 1 to July 3, 1954. He left Barksdale right after midnight on July 3, 1954, and drove to Independence. The trip took 5½ to 6 hours. He and Uli decided to get married between 8:00 and 10:00 o'clock a.m. on July 3, and they got married that afternoon in Magnolia, Mississippi. Subsequently, he went overseas to Casablanca in French Morocco. He did not sign the contract before he was married.
Lt. Col. Dennis G. Pace, USAF retired, was qualified without objection as an expert in reading and interpreting USAF personnel records. Pace was given Exhibit P-2, which are various military personnel records of DiVincenti.[3] These records are certified (authenticated) by William D. Bassman, the Chief of the Air Force Reference Branch of the National Personnel Records Center of the National Archives and Records Administration. Pace stated that every morning the USAF did "a head count of the duty status of everyone" and would "fill out a report on it." The records in Exhibit P-2 were extracts made from the "sign-in and sign-out log" that the Change of Quarters (CQ) maintained in the unit orderly room. These records are called "daily strength accountability" records and are permanent USAF records. The "sign-in and sign-out logs" are not permanent USAF records. Pace reviewed the records and testified they showed that DiVincenti returned to Barksdale from leave on June 30, 1954, and left Barksdale to go on leave again on July 3, 1954. DiVincenti's records also show the following: (1) he was on leave from June 8, 1954, to June 30, 1954, and from July 3, 1954, to July 20, 1954, and (2) he arrived in Casablanca on August 8, 1954.
Stanley and Lydia Semcheski testified by way of deposition. Mr. Semcheski stated he met DiVincenti in 1948, the same year he got married. He and DiVincenti were good friends and were both stationed at Barksdale in 1954. Semcheski remembered July 1, 1954, because it was the last time he ever saw DiVincenti. July 1, 1954 was a Thursday and Semcheski saw DiVincenti in the PX (Post Exchange) at Barksdale while *144 he was on his lunch break between 12:30 and 1:00 o'clock p.m. DiVincenti was in uniform. He asked DiVincenti to come to his home for supper that night because he wanted to talk to him about going fishing on July 4th. Semcheski got off of work at 4:30 p.m. DiVincenti arrived at the Semcheski home about 5:30 p.m., and left around 8:30 p.m. On July 2, 1954, DiVincenti called Semcheski at work and told him he could not go fishing on July 4th because he was going home to Independence, Louisiana. DiVincenti did not say he was getting married. Mrs. Semcheski essentially stated that her testimony would corroborate that of her husband.
Joseph D. Lupo identified his signature as the notary on the contract. He testified he commenced practicing law in 1946 and had notarized things for Uli over the years. He did this work for Uli as a courtesy, and, because she was not a paying client, he did not set up a client file on her. He looked through his files and found nothing on this transaction. He did remember talking to Uli about the contract. Uli owned land before she was married and wanted to put improvements on the land that would be her separate property. Uli asked him to draw up the document. He recalled DiVincenti being present for the execution of the contract. He thought the contract was executed at the post office, but subsequently said he was not sure where it was signed. He could not specifically recall the execution of the contract but stated it was properly executed because that is "the usual procedure". Uli was not married when the contract was executed. When Lupo was questioned about the four year delay in recording the contract, he replied that because Uli was not a paying client she should handle the recordation, that he gave Uli the contract and told her she should have it recorded and stated "I left that up to her." Finally, Lupo testified he would never back-date a document.
Maggie L. Monistere testified she worked in the post office with Uli, and she and Uli retired on the same date in 1972. When she was shown the contract, she stated "... that's my signature and I don't remember nothing." She did remember that Uli asked her to sign the contract, and she did it for her. She thought the contract was signed at the post office, but she did not recall who was present.
Sam L. Levatino testified he worked at the post office from 1937 to 1979. He identified his signature but could not recall anything about the contract.
Reginald J. McIntyre testified that in 1974 Uli was in the process of buying some land and he talked to DiVincenti about it. DiVincenti told him that he had signed a "separate property agreement" with Uli, and it was unnecessary for him (DiVincenti) to sign a declaration of separate property in Uli's sale. Later in about 1985 or 1986, DiVincenti told him that he (DiVincenti) signed a "marriage agreement" before he was married and before he went overseas, but that the contract should have been torn up after he came back from overseas. Reginald denied giving a copy of the contract to DiVincenti and denied giving a copy to the sitter to give to DiVincenti. Reginald testified that on an unspecified date, Uli gave him a "green book" that contained numerous entries in Uli's handwriting. Uli asked him to put it in his safety deposit box. One of the entries is identified as "Last Will-1983" and another is entitled "Notes" and states the following:
Married Angelo D. DiVincentiJuly 3-1954 in Magnolia, Miss. He was in Air Force left immediately for England There was Marriage Contract issued on July 1-1954 for separation of all properties, securitiesfuture earningsI retained my maiden name legallyundertook all liabilities and responsibilities on my ownI was employed in Post Office  for 46 yearsretired in July 1972
Reginald discussed the separate nature of Uli's property with her on several occasions.
Rodney P. McIntyre testified his mother and Uli were sisters. DiVincenti was 12 years younger than Uli. Two or three months before the trial, Rodney and DiVincenti talked about the contract. DiVincenti *145 admitted signing the contract "because I was getting ready to go overseas" and said "it was supposed to be torn up when I got back." DiVincenti told Rodney "he signed it before the marriage."
DiVincenti denied making the admissions attributed to him by Reginald and Rodney McIntyre.
At the conclusion of the testimony, the trial judge gave the following oral reasons for his factual findings:
THE COURT: Factually, what the case boils down to is a swearing contest between the opposing parties. Therefore, the Court has to look to what other evidence sheds some light on the true situation.
I am more impressed with the military record aspect of the case than I am with any other testimony or evidence. That record indicates that Mr. DiVincenti was in Shreveport on the date of the execution of the alleged marriage contract on July 1, 1954.
Since a person cannot be in two places at once or at the same time, it's obvious that he wasn't present at the execution of the marriage contract.
I find the marriage contract executed July 1, 1954 to be null and void and of no validity.

VALIDITY OF TRIAL COURT'S FINDINGS OF FACT
The appellant asserts the following assignment of error:
The trial court erred in holding that Angelo Divicenti [sic] had met the burden of proof necessary to prevail in an action for fraud and by relying on old military records as being able to rebut the authenticity of a separation of property agreement.
(Emphasis added)
Prior to 1980, a matrimonial agreement was a contract in which prospective spouses could establish a regime of separate property (rather than have the legal regime of community property as provided by law). La.C.C. art. 2325 et seq. (1870). Cf. La.C.C. art. 2328 as enacted by Acts 1979, No. 709, effective January 1, 1980. Prior to 1980, a matrimonial agreement had to be executed in the form of an authentic act, and it had to be executed prior to the marriage. La. C.C. arts. 2328 and 2329 (1870). Comments (a), (b) and, in part, (c) for La.C.C. art. 2328, as enacted by Acts 1979, No. 709, provide as follows:
(a) Spouses are free to establish a matrimonial regime of their choice subject to limitations contained in this Title and other laws. Arts. 2329, 2330, and 2337, infra; cf. C.C. Art. 11 (1870). In the absence of a matrimonial agreement excluding the legal regime, the spouses are subject to it.
(b) A matrimonial agreement is governed by the general rules of conventional obligations unless otherwise provided in this Title. The provisions of a matrimonial agreement may not prejudice third persons. See C.C. Arts. 1502 (1870) and 2036 (Rev.1984).
(c) Under the Louisiana Civil Code of 1870, a matrimonial agreement was a part or a species of marriage contract, that is, an antenuptial agreement determining the property relations of the future spouses as between themselves and toward third persons. Cf. C.C. Arts. 1734-1755 and 2325-2437 (1870); 8 Planiol et Ripert, Traité pratique de droit civil francais 51 (2d ed. Boulanger 1957).
A matrimonial contract is a nominate contract. La.C.C. art. 1914. As a nominate contract, it is subject to the general rules governing conventional obligations (contracts) found in Title IV, Book 3 of the Civil Code (La.C.C. arts. 1906-2057). See La.C.C. art. 1915. However, as a nominate contract, it is also subject to the special rules specifically pertaining to it in La.C.C. art. 2325 et seq. (1870) when those rules modify, complement, or depart from the general rules of Title IV. La.C.C. art. 1916.
An authentic act is a writing executed before a notary public, or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it. La.C.C. art. 1833. The matrimonial agreement filed in *146 evidence herein is in the form of an authentic act. An authentic act constitutes full proof of the agreement it contains, as against the parties, their heirs, and successors by universal or particular title. La. C.C. art. 1835. Thus, a party who asserts that an obligation is null (as DiVincenti does herein) must prove the facts or acts giving rise to the nullity. La.C.C. art. 1831. Further, La.C.C. art. 1848 provides as follows:
Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement. (Emphasis added)
See, for example, Succession of LeBlanc, 577 So.2d 105 (La.App. 4th Cir.1991); Lamartiniere v. Lamartiniere, 520 So.2d 828 (La.App. 3rd Cir.1987).
The vices of consent in contract cases are (1) error, (2) fraud, (3) duress and (4) lesion, and are provided for in La.C.C. arts. 1948-1965. In the instant case, DiVincenti alleges he was fraudulently induced to sign the matrimonial agreement and it was fraudulently back-dated. Contractual fraud is defined in La.C.C. art. 1953 as follows:
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
The burden of proof[4] in contractual fraud cases is provided for in La.C.C. art. 1957 as follows:
Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence.
(Emphasis added)
A contract is null when the requirements for its formation have not been met. La. C.C. art. 2029. When the vice of consent of fraud has been proven, the contract is relatively null. La.C.C. art. 2031. When a relatively null contract has been declared null by a court, the contract is deemed never to have existed, and the parties must be restored to the situation that existed before the contract was made. La.C.C. art. 2033.
Whether a contract should be annulled because fraud vitiated the consent of one of the parties is a factual question to be decided by the trial court. LaCaze v. State, Department of Transportation and Development, 541 So.2d 322 (La.App. 3rd Cir.), writ denied, 546 So.2d 1224 (La.1989). The Louisiana Supreme Court in Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989) stated the following about appellate review of factual findings of a trial court:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of *147 credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo....
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong....
(Footnotes omitted; citations omitted)
A review of the trial judge's reasons for judgment shows that he (in essence) accepted the testimony of DiVincenti and the Semcheskis and rejected that of Lupo and the McIntyres. He was impressed with the military records of DiVincenti as corroboration of the testimony presented by DiVincenti and the Semcheskis. This testimony also is partially corroborated by the filing date of the contract that was in 1958, the year in which DiVincenti asserted he actually signed the contract. After a thorough review of the record, I conclude the factual findings of the trial judge are not clearly wrong. The evidence accepted by the trial judge proves fraud by a preponderance of the evidence.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] The case was set for trial before Judge Joseph E. Anzalone on March 28, 1989. Midway through the trial, however, Judge Anzalone discovered he was a potential witness. He declared a mistrial and recused himself. The case was retried in 1991. The testimony and exhibits from the previous trial were adopted by joint stipulation.
[2] Louisiana Civil Code article 2331, as amended in 1979, now provides that a matrimonial agreement shall be made by authentic act or by an act under private signature duly acknowledged.
[1] The appellant obtained an order for a suspensive appeal, but no suspensive appeal bond was ever filed.
[2] On cross-examination, DiVincenti said McIntyre may have given the copy to Shirley Gottleib, one of Uli's sitters, who gave it to him.
[3] The admissibility of these records is not contested in this appeal. See La.C.E. art. 803(6).
[4] La.C.C. art. 1957 was enacted by Acts 1984, No. 331, effective January 1, 1985. Contrary to what appears in the Comments for Article 1957, prior to 1985, the burden of proof in contractual fraud cases was clear and convincing evidence. Hall v. Arkansas-Louisiana Gas Company, 368 So.2d 984 (La.1979); Marcello v. Bussiere, 284 So.2d 892 (La.1973). For a definition of what constitutes clear and convincing evidence, see State in the Interest of J, K and T, 582 So.2d 269, 275 (La.App. 1st Cir.), writ denied, 583 So.2d 1145 (La.1991). The degree of proof and the allocation of it are rules of evidence. E. Cleary, McCormick's Handbook of the Law of Evidence, §§ 336-341, pp. 783-802 (1972). The burden of proof in a case is that which is set forth in the law on the date of the trial. Schwab v. Galuszka, 463 So.2d 737, 739 (La.App. 4th Cir.), writ denied, 464 So.2d 1386 (La.1985). Cf. State v. Pesina, 541 So.2d 370 (La.App. 2nd Cir.1989). La.C.C. art. 1957 does not provide for a different burden of proof for contracts evidenced by authentic, or any other type, act. Cf. LaCaze v. State, Department of Transportation and Development, 541 So.2d 322 (La.App. 3rd Cir.), writ denied, 546 So.2d 1224 (1989). There is some jurisprudence that indicates clear and convincing evidence is necessary to nullify an authentic act. Eymard v. Terrebonne, 560 So.2d 887 (La. App. 1st Cir.1990); Pierre v. Donaldsonville Motor Co., 22 So.2d 291 (La.App. 1st Cir.1945). The Pierre case was decided before La.C.C. arts. 1848 and 1957 were enacted by Act 331 of 1984. The Eymard case failed to consider La.C.C. arts. 1848 and 1957 (the authentic act in that case was executed on November 21, 1978).