662 So.2d 58 (1995)
Lane N. MELTZER
v.
Sarah A. MELTZER.
Nos. 95-CA-0551, 95-CA-0552.
Court of Appeal of Louisiana, Fourth Circuit.
September 28, 1995.
Writ Denied January 5, 1996.
Phillip A. Wittmann, Tondra N. Heiman, Deborah Ann Pearce-Reggio, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for Plaintiff-Appellee.
Max Nathan, Jr., Raymond P. Ward, Sessions & Fishman, New Orleans, for Defendant-Appellant.
Before LOBRANO, ARMSTRONG and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
On 21 October 1993, Lane N. Meltzer (Lane) sued his wife, Sarah Allen Meltzer (Sarah), for divorce under the provisions of La.C.C. art. 102. Sarah accepted service and waived issuance and service of citation and formal service of process on 8 November 1993. On 31 March 1994, Lane sued Sarah for divorce under the provisions of La.C.C. art. 103, and subsequently moved without opposition to transfer and consolidate the case with the original divorce action. The cases were consolidated on 10 May 1994. On 15 June 1994, Sarah filed a petition for declaratory judgment to determine the validity of the Marriage Contract executed by the parties on 10 November 1976. On 20 June 1994, a judgment of the Civil District Court for the Parish of Orleans granted Lane's *59 petition for divorce, and, following a hearing on 26 July 1994, that court rendered judgment finding the Marriage Contract to be valid. From the latter judgment Sarah appeals. We affirm.

STATEMENT OF FACTS
The parties agree that they were married on 22 November 1976 in Atlanta, Georgia, were physically separated on 1 September 1993, have lived separate and apart from that time forward, and no children were born of their marriage. Sarah admits that she executed the Marriage Contract on 10 November 1976, but denies that it was executed in the presence of a notary public and two witnesses.
The contract was registered in Conveyance Office Book 752, Folio 421 and 422 on 6 April 1978. Its terms are not in dispute. The parties to the contract clearly and unequivocally reject the community property regime, and acknowledge that each had been represented by independent counsel of his or her own choice in connection with the making of the agreement.
At the hearing on 26 July 1994, the parties to the contract, the notary public before whom it was executed and the two witnesses testified.
Louis G. Shushan, the notary and Lane's first cousin, testified that he has practiced law for forty-one years. He recognized the contract when it was shown to him, but had no independent recollection of the contract from the time of its execution, eighteen years previous. He identified his signature, and identified witness Linda Condon as Lane's secretary at the time the contract was executed and identified witness Carol Lazaro as his own secretary for the last twenty-eight years. He recalled that Sarah was represented at the time by attorney, now United States District Judge Martin L.C. Feldman. He did not recall whether all parties were in his office at the time the contract was executed. He said it was not unusual at the time for all the parties not to be present at the same time when acts were executed. He testified that if he signed this act, all of the signatories came into his office and signed it. He testified that he had no reason to believe that he did not follow the requisite procedure of having each party and witness sign before him.
Sarah testified that Lane presented the contract to her about two weeks before their wedding date, and suggested she take it to a lawyer to "have him check it out." Sarah testified that she took the contract to Feldman, whom she described as her lawyer and a friend. She admitted having had the opportunity to obtain legal advice in connection with the contract. She admitted having signed the contract, but testified that she did so outside the presence of Mr. Shushan, in "Shepard's office"[1] on the 31st floor 1010 Common Street in New Orleans. She testified that Mr. Shushan's office was on the 5th floor of the same building, but that her first visit to Mr. Shushan's office occurred after her marriage to Lane in conjunction with the sale of a parcel he had acquired with his first wife. Sarah denied that Linda Condon was present when she signed the contract, and denied ever having met Carol Lazaro.
Sarah testified that during her marriage to Lane she maintained a separate account into which she deposited the income she received from her property, and to which Lane had no access. It is uncontroverted that during the entire seventeen year existence of their marriage, Lane and Sarah conducted their financial affairs in conformity with the terms of the Matrimonial Agreement.
Lane testified that the contract was prepared by Mr. Shushan's office. He gave it to Sarah, to be reviewed by her attorney. Sarah told him she had talked to her attorney about the contractual provisions and was prepared to sign it. It was Lane's understanding that the contract provided that his and Sarah's properties were separate, and what was his remained his, and what was hers would remain hers. Lane could not recall who was present when the contract was signed, and recalled that it was signed in Shepard's office. Lane testified, and Sarah admitted, that she eventually left him. He testified that he had feared she would leave him as she had left her two former husbands.
*60 Linda Condon testified that in 1976 she was secretary of a partnership in which Lane had an interest. Her recollection was that she signed the Marriage Contract in Lane's office. She did not recall if Mr. Shushan or Ms. Lazaro were present, although she did recall Mr. Shushan's coming to Lane's office from time to time. She testified that Mr. Shushan's office was on the 15th floor and Lane's office was on the 31st floor of the 1010 Common Street Building.
Carol Lazaro testified that she has been Mr. Shushan's legal secretary for twenty-seven years, and had no recollection of the actual signing of the Marriage Contract. She testified that she was sure she met Sarah when the contract was signed. Ms. Lazaro testified that she believed the Marriage Contract was executed by the parties in front of the witnesses. According to Ms. Lazaro, Mr. Shushan was careful that all requisites for a notarial act were met, particularly after his involvement in the Louis Johnson case in late 1975 or early 1976 wherein Mr. Shushan was required to prove in court that he had met the codal requirements for the execution of an authentic act.
In its Reasons for Judgment, the trial court found:
Of the five [witnesses], Mrs. Meltzer was the only one to claim that she recalled the circumstances surrounding the execution of the document nearly seventeen years ago. She stated that she signed the document in the office of Shepard Latter at 1010 Common Street with only Lane Meltzer present. However, this testimony was weakened by her failure to recall another incident which occurred soon after the execution of the Marriage Contract.

SPECIFICATION OF ERROR: The trial court was clearly wrong in finding that Sarah Meltzer did not prove the Marriage Contract was null.
Sarah contends that she offered sufficient proof that the execution of the Marriage Contract did not comply with the formal requisites set forth in La.C.C. art. 2328, which provided in 1976 that every matrimonial agreement must be made by an act before a notary and two witnesses.
Plaintiff's burden of disproving the validity of an authentic act is indeed heavy. Planiol wrote:
The person who produces an authentic act, regular in appearance, does not need to prove its authenticity. The act comes accompanied by exterior signs difficult to imitate ... These exterior signs suffice. As Dumoulin said in speaking of this kind of writing: "Scripta publica probant se ipsa." As a result, the public act which is regular in appearance, enjoys a presumption of authenticity, which reverses on this point the burden of proof: if the attribution of the act to its apparent author is contested, the latter who offers it has nothing to prove; it is for his adversary who denies the authenticity to demonstrate the falsity of the act, and he cannot make this proof except by the perilous means of the "inscription de faux" (above Nos. 83-85).[2] Planiol, Traite Elementaire de Droit Civil, Vol. 2, No. 88. (Emphasis added.)
In the case at bar, Sarah does not contend that the Matrimonial Agreement was forged. Neither does she contend that she or Lane or the witnesses or the notary did not sign the document, nor that it was procured through any vice of consent such as duress, fraud or error. She admits that she had two weeks within which to consult with her own able counsel, Judge Feldman, and to determine whether she would renounce during this, her third marriage, the benefits and responsibilities of the community property regime then in effect in Louisiana. Sarah's only basis for reversing seventeen years of financial activity based upon a separate property regime is not that any signature, including her own, on the document is forged or fraudulently obtained or otherwise not authentic, but rather that she signed the document in the presence only of her then fiance.
Historically, the reason for the requirement of execution of the marriage contract before a notary and for its recordation was to protect the sanctity of the agreement *61 from the danger that a contract under private signature, not recorded, could easily be destroyed and the matrimonial agreement inevitably changed through the obligatory application of statutory community. Planiol, supra, Vol. 3, No. 806.[3]
Planiol notes the significance of predictability in his discussion of the effect of these contracts on third parties dealing with married persons. Absent a recorded contract, "people were afraid to deal with married persons who claimed they had marriage contract [sic]; thus even spouses in good faith had their credit jeopardized." Planiol, supra, Vol. 3, No. 809. In the instant case, where the parties owned, bought and sold substantial real estate holdings, this aspect, the immutability of the marriage contract, is most significant.
The Louisiana Civil Code defines an authentic act:
An authentic act is a writing executed before a notary public ... in the presence of two witnesses, and signed by each party who executed it, by each witness, and by the notary public before whom it was executed.
To be an authentic act, the writing need not be executed at one time or place, or before the same notary public or in the presence of the same witnesses, provided that each party who executes it does so before a notary public, ... and in the presence of two witnesses and each party, each witness, and each notary public signs it.... La.C.C. art. 1833.[4]
This Court interpreted these formal requirements in the context of an antenuptial marriage contract, holding:
[A]ll that the law requires [for the validity of an authentic act] is that the notary and witnesses be present, C.C. 2328, when each contracting party signs the act, C.C. 2234, and that notary and witnesses themselves also sign the act, although not necessarily at the time that any party signs it. Accordingly, the act before us is not invalid because of the simple facts that the husband and wife in this case did not execute the act in the presence of each other, and that the notary and witnesses did not sign the act at the time that one (or either) party signed it.
Our basic reasoning is that substance should prevail over form unless the law unmistakably requires a contrary result. Here the mature spouses-to-be must be presumed to have desired and consented to the exact agreement contained in the written instrument. The law only requires that the agreement be "made by an act before a notary and two witnesses," C.C. 2328: such an act is an authentic act, C.C. 2234, "executed before a notary public ..., in the presence of two witnesses...." Nowhere does the law expressly require that the notary and the witnesses sign the act in the presence of the parties,....
Rittiner v. Sinclair, 374 So.2d 680, 685 (La.App. 4th Cir.1978). See also, Nunez v. Nunez, 436 So.2d 682, 683 at footnote 1 (La.App. 4th Cir.1983).
An authentic act in Louisiana, as under the French Code, is presumed to be valid, and this presumption is established in the interest of public order, to maintain peace among men and to prevent contestations concerning the proof or evidence of their conventions. Succession of Tete, 7 La. Ann. 95, 96 (La.1852).
Where, as here, the memories of the signatories are blurred by the passage of time, one seeking to invalidate an apparently authentic act must present strong and convincing proof of such magnitude as to overcome the presumption of verity of notarial acts. DiVincenti v. McIntyre, 611 So.2d 140, *62 142 (La.App. 1st Cir.1992), writ denied 614 So.2d 1264 (La.1993).
Sarah does not contend that any of the five signatories failed to sign the Marriage Contract or that any of the signatures were obtained by fraud, mistake or duress. Neither did she offer any proof that Lane's signature was not signed in the presence of the notary and two witnesses. As to her own signature, only Sarah testified to an exact recollection of the signing process, and her testimony standing alone, even if accepted by the trier of fact, would be insufficient to overcome the presumption of validity. See, DiVincenti, 611 So.2d at 141-143.
We are mindful that a marriage contract should be maintained if possible. Id. At the time of the execution of the Marriage Contract, Sarah was thirty-seven years old, twice divorced, and represented by able independent counsel. Lane, seventeen years her senior, was likewise represented. The notary was an experienced practitioner who had recently been required to offer proof in court that another of his notarial authentic acts had been properly executed. The record is devoid of any proof, even were we to consider Sarah's testimony, which was rejected by the trial court, that the Rittiner standard was not met.
The trial judge, who observed the witnesses, chose not to accept Sarah's testimony. This credibility determination can virtually never be manifestly erroneous, and we find it to have been within the sound discretion of the trier of fact. Stobart v. State of Louisiana, through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). We will not disturb that credibility choice.
Sarah's testimony having been rejected by the trial court, we turn to the testimony of the remaining witnesses. The trial court accepted Mr. Shushan's testimony that he had no reason to believe he did not follow the requisite procedure in the execution of the Marriage Contract, and found support in Ms. Lazaro's testimony that she was sure that the parties and other witness came to Mr. Shushan's office to execute the document because it was his practice to have everyone present in his office when notarized documents were executed. The trial court found this testimony to have been bolstered by Mr. Shushan's participation in prior litigation concerning the validity of an authentic act. The trial judge found that Ms. Condon did not recall the circumstances of the execution. We find these conclusions to be supported by the record taken as a whole. Sarah relies on Lane's testimony that he could not refute her testimony as an admission by Lane of the truth of her version of the signing; however, a careful reading of the record shows that Lane testified that he had no specific recollection of the signing, and, therefore, could not conscientiously say that her testimony was incorrect. We cannot equate a failure to remember with corroboration of an adverse party's testimony.
The trial court concluded that the evidence offered by Sarah as a whole did not support by a reasonable preponderance of the evidence that the Marriage Contract was not an authentic act. We find this conclusion to be supported by the record as a whole, and find no manifest error in the trial court's determination.
We affirm the trial court's judgment finding that Sarah A. Meltzer failed to prove by a reasonable preponderance of the evidence that the Marriage Contract executed by and between Lane Meltzer and Sarah Allen on 10 November 1976 was invalid.
AFFIRMED.
NOTES
[1] The reference is to Shepard Latter. According to Mr. Shushan, Latter died in 1973.
[2] The "inscription de faux" is the name of a special procedure which serves to establish that an instrument has been forged. Planiol, supra, Vol. 2, No. 83.
[3] This immutability of the matrimonial agreement in French law was a fundamental principle: the will of the parties expressed prior to the marriage was regarded as sacred and worthy of protection against subsequent assault by a party seeking institution of the statutory community system. See, Planiol, supra, Vol. 3, Nos. 813-814.
[4] Acts 1984, No. 331, sec. 1, effective 1 January 1985. According to Comment (a) to the present article, this Article reproduces the substance of C.C. Art. 2234 (1870), and does not change the law.