| .FITZSIMMONS, J.
William A. Couvillion, M.D. appeals a partial judgment by the trial court holding a marriage contract null and void.[1] Fol *475 lowing our review of the record and controlling law, this court reverses.
Crythis K Bristow Couvillion filed a petition for divorce from her husband, Dr. Couvillion. Thereafter, she filed a “petition for partition of community property and settlement of claims and petition to declare alleged separation of property agreement invalid”. Dr. Couvillion denied the existence of a community property regime pursuant to a prenuptial agreement and marriage contract. Following a hearing on the issue of the validity of the prenuptial marriage contract, the trial court held that no prenuptial agreement had been signed by authentic act or under private signature prior to the September 4, 1992 marriage of the parties and, therefore, they were subject to a community property regime. Dr. Couvillion brings the current appeal.

DISCUSSION

On its face, the “Prenuptial Agreement and Marriage Contract” between the Cou-villions appears to be an authentic act executed on September 2, 1992. Mrs. Couvillion does not contest that she signed the contract; however, she maintains that the agreement was fraudulently confected. Mrs. Couvillion asserts that the agreement was not signed by her in the presence of a notary prior to the September 4, 1992 marriage. Mrs. Couvillion admits that the signature on the prenuptial agreement is hers; however, she contends that the document was backdated by her husband and presumably by the notary public.
As we initiate our review of the trial court’s decision, we are cognizant of the pronouncement of La. C.C. art. 1835. That civil code article dictates that an |sauthentic act constitutes full proof of the agreement it contains. An authentic act is cloaked in the presumption of genuineness; therefore, a party contesting the authenticity assumes the burden of proving the invalidity. DiVincenti v. McIntyre, 611 So.2d 140, 141 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1264 (La.1993). Additionally, the jurisprudence has established that the high degree of sanctity afforded an authentic act necessitates that the party contesting its validity present evidence beyond a mere preponderance of the evidence. Id. Strong or convincing evidence constitutes the requisite burden of proof. Id. Although parol evidence is generally not admissible to alter or contradict the terms of an authentic act or written instrument, it may be admitted to prove fraud, mistake, illegality, want or failure of consideration, to explain an ambiguity when such explanation is not inconsistent with the written terms, or to show that the writing is only part of an entire oral contract between the parties. Scafidi v. Johnson, 420 So.2d 1113, 1115 (La.1982).
In written reasons for judgment, the court addressed the salient question of whether the prenuptial document was, in fact, signed two days prior to the parties’ entering into their marriage.[2] After weighing both sides of the evidence, the court pronounced that it believed that Mrs. Couvillion did not sign the documents until after the marriage in August 1994. In support of this determination, the court *476 expressly pointed out that there were “two different copies signed two different times by all the parties, filed into the record in 1994 and then again in 1997.” Although no supporting evidence was entered into the record, counsel for Mrs. Couvillion stated that a certified true copy of the prenuptial agreement was filed into the court record on August 30, 1994. The reasons for .judgment | ¿particularly noted that the agreement was not filed with the court until one week after Mrs. Couvillion stated she had signed and Federal Expressed it to Baton Rouge in 1994. Additionally, the court deemed credible Mrs. Couvillion’s evidence that she was physically located in Atlanta on the purported date of the signing in Baton Rouge. Finally, the court’s conclusion hinged on the testimony of Harris D. Copenhaver. He was the notary public for the marriage contract. Mr. Copenhaver stated that he occasionally notarized signatures of persons in their absence.
Scrupulous perusal of the evidence introduced at the hearing reveals the following substantive facts. Dr. Couvillion testified that he hand-delivered a copy of the prenuptial agreement document to Mrs. Couvillion for her review before September 4, 1992. On September 2, 1992, he signed the agreement before Mr. Copen-haver in Mr. Copenhaver’s office. Mr. Copenhaver stated that he recalled Dr. Couvillion signing the prenuptial agreement the morning of September 2, 1992. Dr. Couvillion indicated that his fiancé would be in to sign it later that day. Although admitting a faint recollection of the details, Mr. Copenhaver was under the impression that Mrs. Couvillion had arrived around the middle of the day, or early afternoon, to finalize the premarital contract before him. In response to questioning, Mr. Copenhaver testified that approximately ten percent of the time he had notarized signatures out of the presence of the signatory. Nevertheless, he qualified such a relaxed practice as being reserved only for clients “that [he] knew real well and knew the signatures .... ” Neither Dr. Couvillion nor Mrs. Couvillion had been a prior client of Mr. Copenhaver. Mr. Co-penhaver emphatically denied that Dr. Couvillion came to him in 1994 with the agreement and prevailed on Mr. Copen-haver to backdate it. He testified that he had never backdated any document.
| sMrs. Couvillion testified at the hearing that she was in Atlanta, Georgia, on September 2, 1992, where she remained until the day of her marriage on September 4, 1992. In support of her contention that she was physically in Atlanta, Mrs. Couvil-lion presented into evidence a copy of her BellSouth Mobility monthly bill. That statement indicates that numerous calls were made and received on her mobile phone throughout the day and evening of September 2, 1992. She also filed into evidence a copy of her one-way ticket from Atlanta to New Orleans on the morning of September 4, 1992, the day of her marriage. Mrs. Couvillion further testified that she was extremely busy professionally immediately prior to her marriage. She had scheduled seven round-trip airline flights for a business purpose during the same period of time, and she was simultaneously arranging transportation for her son, who was attending a new school. She stated that she kept the unsigned prenuptial document in her drawer until August 24, 1994, when she got a call from her husband’s attorney. He requested the prenuptial agreement that had been sent to her in 1992. She testified that she signed and sent the prenuptial agreement via Federal Express in 1994, and that Mr. Couvillion’s signature was not on the agreement at that time.
Mr. Carey Guglielmo, Sr. also testified. He was an attorney who represented a *477 mortgage lender when Dr. Couvillion mortgaged two parcels of ground on July 15, 1993. In the mortgage agreement, Mrs. Couvillion appeared and attested to the existence of a prenuptial agreement and marriage contract. Mr. Guglielmo testified that he possessed a signed copy of the prenuptial agreement and marriage contract in his files in conjunction with the execution of that mortgage. He stated that he would not have allowed the loan to close had the prenuptial agreement not been in effect as of the finalization of the loan to Dr. Couvillion in 1993. His file notes reflected that he had received a telephone Incalí from Mrs. Couvillion in conjunction with the transaction, in which she objected to a provision in the mortgage document that referred to a “separate property system.” Mr. Guglielmo complied with her request for an alteration. Mrs. Couvillion did not, however, object to the reference to the prenuptial agreement in the mortgage document. The mortgage document of 1993, which was admitted into evidence, contains an authenticated acknowledgment by Mrs. Couvillion that “she and Mortgagor entered into a prenuptial agreement and marriage contract and that she has no ownership nor other rights in the above described property, the said property being the separate property of her husband, Mortgagor; it being understood that she has no personal liability for the mortgage indebtedness.”
The record on appeal contains four copies of the controverted prenuptial agreement and marriage contract. As is pointed out by the court in its reasons, it appears that the contract was filed into the court record on two occasions. Mr. Copenhaver certified the 1992 document as a true copy on August 24, 1994, after which it seems to have been filed into the court record as “Instrument # 563, Bundle 10537.” Although Mrs. Couvillion submitted into evidence a copy of a Federal Express bill allegedly related to the transmittal of the signed copy of the agreement from Atlanta to Dr. Couvillion in Baton Rouge, it should be noted that the delivery of that package was not made until midday of August 25, 1994. It would have, therefore, been logistically impossible for Mr. Copenhaver to have certified the document as a true copy on the previous day of August 24, 1994.
Dr. Couvillion also testified that he personally filed the prenuptial agreement into the court records in 1997 because the couple had temporarily separated during that year. That document was recorded as “ORIG 776 BNDL 10824.” Both recorded authentic acts, which appear to be duplicate originals due to the slightly |7noticeable deviations in their placement, provide that the prenuptial agreement was confected on September 2, 1992. Neither party contests the validity of the signatures. Another copy of the same prenuptial agreement and marriage contract filed in evidence was obtained from Mr. Gugliel-mo’s files in conjunction with the 1993 mortgage.
Harking back to the presumption of genuineness afforded to authentic acts, as well as the required “convincing proof’ to invalidate an authentic act, the trial court committed legal error. The court erred in finding Mrs. Couvillion’s testimony, phone bill, one-way ticket to New Orleans, and the fact that a certified copy of the prenuptial agreement was filed a week after Mrs. Couvillion purportedly sent it via Federal Express delivery to New Orleans, carried sufficient weight to overcome the presumption of verity of a notarial act. DiVincenti, 611 So.2d at 141-142. The phone bill and one-way ticket did not eliminate a circumstance in which she could have been in Baton Rouge on September 2, 1992, and the Federal Express docu *478 mentation did not correlate with the true copy certification.
Other than Mrs. Couvillion’s testimony, there is no substantive evidence that would support the existence of fraud associated with the prenuptial agreement. Mr. Co-penhaver explicitly denied having backdated the document under review. Mr. Gu-glielmo, another attorney, possessed a copy of the prenuptial agreement in 1993, and Mrs. Couvillion expressly acknowledged the existence of the premarital agreement in conjunction with a mortgage. The fact that the prenuptial agreement might not have been recorded until years after its completion or that it might have been recorded on more than one occasion does not vitiate the viability of the agreement as a contract between the parties. Accordingly, this court reverses the judgment of the trial court to hold that the prenuptial agreement and marriage 1 scontract dated September 2, 1992 was in effect during the matrimonial regime of Dr. and Mrs. Couvillion. All costs associated with this appeal are assessed to Crythis K. Bristow Couvillion.
REVERSED AND RENDERED.
GAIDRY, J., concurs.

. The partial judgment has been designated by the trial court as a final judgment with no just reason for delay in its appeal.

. A marriage contract completed after the matrimonial regime has been established requires a different procedure that entails prior court approval. Louisiana Civil Code article 2329 provides, in part, "Spouses may enter into a matrimonial agreement that modifies or terminates a matrimonial regime during marriage only upon joint petition and a finding by the court that this serves their best interests and that they understand the governing principles and rules.”